Irmgard S. GERSTLE and Constance
P. Ciancio, Plaintiffs,

v.

CONTINENTAL AIRLINES, INC., a corporation, and Air Line Pilots Association, International, a labor organization, Defendants.

Civ. A. No. C-1687.

United States District Court,
D. Colorado.

Feb. 27, 1973.

Hugh J. McClearn, McClearn & Heppenstall, P. C., Denver, Colo., for plaintiffs.

Gordon G. Greiner, Bruce W. Sattler, Holland & Hart, Denver, Colo., for Continental Airlines, Inc.

Robert Savelson, Cohen, Weiss & Simon, New York City, and John Criswell, Englewood, Colo., for Air Line Pilots Association, International.

## OPINION AND ORDER

FINESILVER, District Judge.

### STATEMENT OF THE CASE

. Plaintiffs, Gerstle and Ciancio, seek Continental Airline reinstatement to positions as flight hostesses, determination of seniority, back pay and other relief pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. Section 2000e et seq. [hereinafter sometimes referred to as Title VII].

Both plaintiffs at the commencement of their employment with Continental signed statements that in the event of marriage "my resignation becomes automatic." [1]

Both plaintiffs served as flight hostesses for Continental Airlines at the

---

1. The statement reads:

 "It is my understanding that my employment with Continental Air Lines, Inc., as a Flight Hostess is obtained upon my assurance that I am not now married. It is my further understanding that in the event of my marriage, my resignation becomes automatic, and this statement and my signature hereto can be considered resignation effective immediately upon my marriage.

 "I further agree that as far in advance as possible, I will notify my supervisor in writing that I plan to marry. In accordance with the above, I will not conceal this fact nor attempt to continue my employment as a Hostess after marriage." (Plaintiff's Exhibit 5–Ciancio).

 The reasons for the "single hostess" rule then in effect was explained at trial by Mr. Harrold Bell, a retired Continental executive. He testified:

 " * * * there was deep concern that there would be an undetected pregnancy with a hostess who might be incapacitated during flight by rough air and there could be a compensable case in event of injury to the fetus. General-

time of their resignations in 1965 and both were married in 1965. They contend that the underlying reason motivating their resignations was Continental's then existing policy prohibiting married hostesses from continuing on the flight line.

Continental contends that plaintiffs terminated their employment of their own accord without regard to Continental's "single hostess" policy [sometimes referred to as "no marriage" rule].

A pivotal question is the applicability of the Civil Rights Act and whether actions taken by plaintiffs themselves preclude relief.

Under the view of the Court neither plaintiff has established entitlement for recovery and their claims are Denied.

### IRMGARD S. GERSTLE

Gerstle's relationship with Continental extended from February 2, 1959 when she was hired as a hostess (stewardess) trainee until November 1, 1968 when she was terminated for taking unauthorized leave. At the time of her final termination, she was an assistant hostess supervisor in Denver.

*The Period February 2, 1959 to January 16, 1966.*

After a short hostess training period, she served as a flight hostess based in Denver from February 24, 1959 to August 31, 1964; on September 1, 1964 at her request, she was transferred to a Los Angeles base and served on Continental's Military Air Command (MAC) routes to the Far East. By letter dated July 31, 1965, she advised Continental that she was going to be married and was resigning effective August 31, 1965.[2] Her resignation makes no mention of forced resignation due to Continental's "single hostess" rule and while evidence is adduced by Gerstle to the effect she informed other hostesses of her intention to resume flying at a later time, plaintiff has failed to establish by a preponderance of the evidence that at the time of her resignation (a) the "single hostess" rule prompted her resignation and (b) that she relayed to Continental's management her desire to return to the flight line and (c) that Continental promised or assured her of a ground position in the President's Club located at Stapleton International Airport or as a Golden Girl (ground hostess).

Gerstle was married on August 15, 1965. She and her husband were extended and availed themselves of a company free "honeymoon traveling pass." This pass was given to hostesses who resigned for marriage reasons.

Effective August 31, 1965, her resignation became final as a flight hostess. In her letter of July 31, 1965, she requested and was granted a ninety day leave of absence commencing September 1, 1965. On November 24, 1965, in a letter to Continental she requested and was granted a further six month extension of her leave of absence; in her letter she indicated that she desired employment in the President's Club.

---

ly it wasn't a good spot for a married woman to be serving in where she was probably the only assistance that could be provided to her passengers in the event of an emergency. That was our belief."

The "single hostess" rule was widespread in the industry and was discontinued by Continental in April 11, 1966.

2. She intended to move to Denver to join her husband, a Denver businessman. Her letter of resignation states:

"Please accept my resignation as a hostess with Continental Air Lines, effective 31 August, 1965, inasmuch as I am to be married on 15 August, 1965. I am scheduled to take my vacation from 18 August, 1965 through 31 August, 1965.

"My association with Continental has been most rewarding. I hope for Continental continued growth and success.

"At this time I request your consideration for a 90 day leave of absence, commencing 1 September, 1965 as nothing would please me more than to retain my company seniority and again be actively associated with Continental Air Lines." (Defendant's Exhibit A–Gerstle).

She next worked for Continental from December 14, 1965 to January 16, 1966, in a temporary capacity in Continental's President's Club in Denver.

*The Period May 3, 1966 to May 16, 1968.*

At her request, Gerstle met with Mr. Mark Kramer, Continental Vice President (Los Angeles) in Denver on May 3, 1966. At the meeting Gerstle suggested that Continental establish a new position whereby she would serve as company representative in hostess relations with Continental hostesses including hostess grievances. Mr. Kramer expressed the view that a new position was not possible. At the meeting, Gerstle further requested reinstatement as a flight hostess to which Mr. Kramer informed her that her resignation as a hostess was final and pursuant to company policy she could not be re-employed in that capacity. At the meeting she requested permanent employment in the President's Club in Denver. She was advised that employment in this capacity was up to Mr. J. K. Karins, manager of the Denver base.

On May 18, 1966, a letter was received by Continental from Mr. Robert Harry, Denver lawyer, wherein reinstatement was demanded and a claim of discrimination made under Title VII of the 1964 Civil Rights Act. (Defendant's Exhibit C—Gerstle).

Continental did not reinstate Gerstle and on May 31, 1966, she filed her claim of sex discrimination with the Equal Employment Opportunity Commission [hereinafter referred to as EEOC]. (Defendant's Exhibit—Gerstle D)

This claim was pending with the EEOC for nearly three years and on April 30, 1969, the EEOC ruled in her favor on the claim and notified her on July 17, 1969, of her right to bring suit. Her attorney on the claim was Mr. J. David Penwell, Denver, Colorado.

However, in the interim, Gerstle persisted in her desire for employment in a ground position.

Mr. Harrold Bell, a Vice President of Continental, in charge of personnel met twice with Gerstle in April and May 1968. The first meeting was in Denver at Gerstle's request; her desire for re-employment was explored and on the second meeting (on April 30, 1968 or May 1, 1968) a tentative agreement was reached whereby (a) she would be re-hired as assistant supervisor of hostesses based in Denver at a salary range of $590 to $825 and the starting rate of $610.00 per month with company seniority and pass privileges and (b) she would drop all claims against the company.

The verbal discussion was formalized into a written instrument dated May 3, 1968. (Defendant's Exhibit—Gerstle E) The agreement by its terms unequivocally settled all claims.

The agreement was sent to Gerstle in Denver by Mr. Bell from his California office. She reviewed the letter with Mr. Penwell, her Denver attorney.

In particular, Gerstle discussed with Mr. Penwell the necessity to drop her EEOC charges as a condition of re-employment. The evidence is clear that Gerstle knew her EEOC claim would have to be dropped if she resumed employment with Continental and that she fully intended to drop her claim against the company.[3]

After reviewing the proposal in great detail with her attorney and her husband, at her request and at Continental's expense, Gerstle traveled to Continental's Los Angeles office, met with Mr. Bell, unequivocally accepted the offer, and countersigned Mr. Bell's letter, indicating her full agreement with all terms including the dropping of the charges against Continental.

 It is clear that the letter agreement dated May 3, 1968, constituted a full release of all claims for alleged discrimination and the agreement was signed freely and voluntarily by Gerstle with full recognition of her rights. She

---

3. This is best exemplified by the fact that Mr. Penwell was paid at or near this time in full for his services and he performed no further service on the EEOC claim.

had legal counseling of her own choosing prior to her written approval of the terms expressed in the letter. Continental acted in a fair way in their re-employment of Gerstle and there was no unfair advantage taken of Gerstle by Continental. Her re-employment by Continental in May 1968 is a complete bar to this action and forecloses any relief.

On May 15, 1968, Gerstle, pursuant to company policy, completed an employment application for her new Denver position. At the designated place for reasons of prior company termination Gerstle inserted <u>marriage</u>. No mention was made by Gerstle of the "single hostess" rule as a reason for prior termination.

*The Period May 16, 1968 to November 1, 1968.*

She commenced her duties as an assistant supervisor of hostesses in Denver during the latter part of May, 1968. However, due to personality friction with her supervisor, Mrs. Fontagneres, on July 9, 1968, Gerstle requested company transfer to either the President's Club or Golden Girl position.

However, the alleged friction dissipated and her problems with Mrs. Fontagneres were resolved. Plaintiff Gerstle did not persist in her transfer request.

On August 23, 1968, Gerstle in written correspondence to her superiors requested a leave of absence during the period October 19 to November 3, 1968; the reasons specified her desire to accompany her husband to a national restaurant convention in Miami.

Due to press of company business and staffing requirements of the Denver office, her request for leave of absence was denied by the Denver base manager and she was so informed around August 26, 1968. She continued in her request for leave and sent another request to Continental's Los Angeles office and the letter was referred to Mr. Charles A. Bucks, a Continental Vice President. He reviewed the matter and in written correspondence to Gerstle dated October 11, 1968, her request was again denied due "to staffing needs of the Denver Office."

In spite of the denial of her requested leave Gerstle left Denver with her husband on October 18, 1968. Her annual Continental pass was used for her travel and that of her husband. On October 19, 1968, she (a) failed to report for work and (b) contrary to company policy she failed to advise her supervisor of her whereabouts so she could be contacted in case of an emergency or work problem.

At trial she testified that she fully realized that if she took the trip she might be terminated.

Gerstle sent Mrs. Fontagneres, her immediate superior, a telegram from New Orleans on October 19, 1968, at 11:07 p. m. advising that she had "a head cold and intestinal flu and that she could not return to work immediately." [4]

The evidence at trial failed to indicate any illness that would prove incapacitating for anything other than a brief period. Her health condition did not prevent her from continuing on her trip from New Orleans to Miami, Freeport in the Bahamas, and New York. It is apparent that her illness had nothing to do with the fact she was not on the job from October 19, 1968, until terminated November 1, 1968.

Plaintiff Gerstle never protested the termination. It is apparent that Continental had justifiable reason to terminate Gerstle for her failure to report to work during the period from October 19 to November 1, and her failure was done intentionally with full knowledge that termination would follow.

---

4. The telegram states:

"Recurring head cold plus intestinal flu prevent my immediate return to work, will advise you of precise date of return as soon as I feel better.
 Best Regards,"
(Defendant's Exhibit—Gerstle L.)

Her course of action in taking leave without authorization is a bar to this action.

## CONSTANCE PORTER CIANCIO

Plaintiff Ciancio's [5] relationship with Continental extended from June 15, 1963, when she was hired as a hostess trainee until June 1, 1965 when she notified Continental of her resignation effective June 15, 1965.

Her letter of resignation states:

"This to advise you of my termination effective June 15, 1965."

At the time of her resignation she was based in Denver and no leave of absence at the time of her resignation was requested by her.

Ciancio was married on May 31, 1965; a child was born as issue of the marriage on December 31, 1965; a second child was born on July 22, 1968.

Upon her resignation a "honeymoon pass" was used by Mr. and Mrs. Ciancio for a trip to Hawaii. At no time did Ciancio inform Continental's management of a desire to continue to fly as a hostess.

The evidence reflects that Ciancio learned of Continental's abrogation of the "single hostess" rule shortly after it became effective in April of 1966. During the period June 1965 until May 1970 she made no attempt to seek re-employment either with Continental or any other potential employer.

However, in 1970 she contacted Continental in Denver and completed an application for employment requesting part-time employment (later interlined to reflect full-time employment at a date and time not ascertainable from the evidence). She did not request reinstatement as a flight hostess.

She again requested ground employment in 1970 and later in March 1971.

Ciancio was joined as a party plaintiff on August 6, 1971; the instant suit was commenced by Gerstle in 1969.

## LAW

Plaintiffs claim that as a result of an unlawful employment practice engaged in by defendant Continental they were forced to resign their employment as flight hostesses with Continental.

In particular, it is plaintiffs' contention that the cause of their leaving Continental's employ coincident with their respective marriages was Continental's "no marriage" policy. They do not argue that at the point of their marriages they were involuntarily terminated, but rather that the existence of the rule was the motivating force behind their resignations. The force of the "no marriage" or "single hostess" rule is argued to be the operative event which resulted in their resignations and thus violative of the mandate expressed in Title VII, Section 2000e–2(a)(1), (2).

The crux of this alleged sex discrimination action, and that which the Court deems controlling, is whether defendant's "no marriage" rule was, in fact, the cause of plaintiffs' resignations.

■ At the outset the Court recognizes that the salutary purpose of the sex discrimination provisions of Title VII is to eliminate disparate treatment of female employees and to place women on an equal footing with men with respect to their employment. *See* Burns v. Rohr Corp., 346 F.Supp. 994, 997 (D.C. Cal.1972); Ridinger v. General Motors Corp., 325 F.Supp. 1089, 1096 (D.C.Ohio 1971); Rosen v. Public Service Electric & Gas Co., 328 F.Supp. 454, 462–64 (D. C.N.J.1970).

It is also clear that the changing jurisprudential and societal climate surrounding women and employment practices has undergone profound revision and enlightenment. Times have changed when, for example, women were prohibited from entering into the practice of law. The classical attitude with respect to the role of women in our society was expressed in a case challenging such a barrier. The United States Supreme

5. Maiden name Constance Porter.

Court in 1872 ruled on the challenge by a married woman from Illinois to a state law that forbade married women from practicing law. The Court's answer was clear:

> "The claim that [under the Fourteenth Amendment of the Constitution] the statute law of Illinois . . . can no longer be set up as a barrier against the right of females to pursue any lawful employment for a livelihood (the practice of law included) assumes that it is one of the privileges and immunities of women as citizens to engage in any and every profession, occupation or employment in civil life. It certainly cannot be affirmed, as an historical fact, that this has ever been established as one of the fundamental privileges and immunities of the sex. On the contrary, the civil law, as well as nature herself, has always recognized a wide difference in the respective spheres and destinies of man and woman. Man is, or should be, woman's protector and defender. The natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life.
>
> . . .
>
> "It is true that many women are unmarried and not affected by any of the duties, complications and incapacities arising out of the married state, but these are exceptions to the general rule. The paramount destiny and mission of women are to fulfill the noble and benign offices of wife and mother. This is the law of the Creator. . . ." Bradwell v. Illinois, 83 U.S. (16 Wall.) 130, 21 L.Ed. 442 (1872).

The stereotyped characterization of women's economic roles or lack thereof has been under constant and persistent attack as being arbitrary, capricious and without logic. The traditional barriers have, however, given way in the wake of a plethora of litigation involving women's rights. The courts have recognized that the woman's role in society has changed, and are now giving judicial implementation to those delayed rights.

*Compare* the views expressed in *Bradwell, supra, with* Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); Heath v. Westerville Board of Education, 345 F.Supp. 501, 505 (D.C. Ohio 1972); Williams v. San Francisco Unified School District, 340 F.Supp. 438 (D.C.Cal.1972); Bowe v. Colgate-Palmolive Co., 416 F.2d 711 (7th Cir. 1969). *See also* Brown, Emerson, Falk and Freedman, The Equal Rights Amendment: A Constitutional Basis for Equal Rights for Women, 80 Yale L.J. 871 (1971); *Note,* Sex Discrimination and Equal Protection: Do We Need a Constitutional Amendment? 84 Harv.L. Rev. 1499 (1971).

This Court is further cognizant that 42 U.S.C. Section 2000e–5(g) of Title VII grants to federal courts plenary powers in fashioning decrees and remedies to insure compliance and to redress "the adverse consequences of past unlawful conduct." Sprogis v. United Air Lines, Inc., 444 F.2d 1194, 1202 (7th Cir. 1971), cert. denied, 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543. *See also* United States v. St. Louis-San Francisco Railway Co., 464 F.2d 301, 309 (8th Cir. 1972); Schaeffer v. San Diego Yellow Cabs, Inc., 462 F.2d 1002, 1006 (9th Cir. 1972); Bowe v. Colgate-Palmolive Co., *supra;* Francis v. American Tel. & Tel. Co., Long Lines Dep't, 55 F.R.D. 202, 208 (D.C.D.C.1972). However, the Court also notes that in order for a "make-whole" remedy to be forthcoming the complaining person must be a victim because of such an unlawful employment practice.

Recently, numerous courts have faced the issue of sex discrimination which arises out of one's marital status. It has been held that an employer's policy of restricting employment to females who remain unmarried, without maintaining a similar restriction for male employees, constitutes discrimination against the female employees because of their sex, in violation of Title VII. *See*

*e. g.,* Jurinko v. Edwin L. Wiegand Co., 331 F.Supp. 1184 (D.C.Pa.1971). This particular discriminatory practice has come into sharp focus with respect to the policy which requires that air line stewardesses must be unmarried. Sprogis v. United Air Lines, Inc., *supra*; Lansdale v. United Airlines, Inc., 437 F. 2d 454 (5th Cir. 1971). *See generally* Fuentes, Federal Remedial Sanctions: Focus on Title VII, 5 Val.U.L.Rev. 374, 381 (1971); 12 A.L.R.Fed. p. 15, §§ 19[a], 22[a], 23[b], 26.

Seemingly, the cases which have dealt with this issue and which subsequently ruled such a "no marriage" policy to be discriminatory and thus in violation of Title VII would be dispositive herein. *But cf.* Cooper v. Delta Air Lines, Inc., 274 F.Supp. 781 (D.C.La.1967). However, the issues raised in previous attacks on the "no marriage" rule are not the issues confronted presently. In *Sprogis, supra,* the issue was whether the "no marriage" rule for air line stewardesses could be justified as a bona fide occupational qualification under pertinent exception in Title VII, 42 U.S. C. Section 2000e–2(e). The court in *Sprogis* rejected United's contention that the "no marriage" rule reflected a bona fide occupational qualification and entered judgment for the plaintiff. *Accord* Braniff Airways, Inc., v. Airline Pilots Ass'n, Walter L. Gray, Referee, Sept. 14, 1965, 65–ARB, ¶ 8,661; Neal v. American Airlines, Inc., EEOC Decision, Case No. 6–6–5759 (1968) CCH Employ. Prac. Guide ¶ 6002; EEOC Decision, Case No. YSF9–060 (1969) CCH Employ. Prac. Guide ¶ 6011; Colvin v. Piedmont Aviation, Inc., EEOC Decision, Case No. 6–8–6975 (1968) CCH Employ. Prac. Guide ¶ 6003.

In the instant action Continental did not assert that its "no marriage" rule qualified as a bona fide exception to the mandate of Title VII pursuant to 42 U. S.C. Section 2000e–2(e). *See e. g.,* Weeks v. Southern Bell Tel. & Tel. Co., 408 F.2d 228 (5th Cir. 1969). The question defendant asks is, but for the "no marriage" rule would plaintiffs have re-

signed their positions? In other words, Continental submitted that plaintiffs' resignations were caused for reasons other than the existence of a "no marriage" rule. In fact, plaintiffs took the position throughout that it was the "no marriage" rule and its concomitant violation of Title VII which *caused* plaintiffs to resign.

■■ Assuming arguendo that Continental's "no marriage" policy was, in fact, violative of 42 U.S.C.A. § 2000e–2(a)(1), *see* EEOC Guidelines on Discrimination Because of Sex, 29 C.F.R. § 1604.4 and cases cited *infra*, this element alone is not sufficient to justify an immediate finding for the allegedly aggrieved plaintiffs. In order for the aggrieved party to succeed there must be demonstrated by the required burden of proof the fact that such discrimination practice or policy was the *cause* of the claimed injury. *See* Goodloe v. Martin Marietta Corp., Civ.Action No. C–2498 (Jan. 13, 1972) (D.C.Colo.) (Winner, J.), app. pending, No. 72–1775. A naked claim of discrimination or discriminatory practices or policies will not justify invocation of the Court's equitable powers. *See* Dewey v. Reynolds Metals Co., 429 F.2d 324 (6th Cir. 1970), aff'd by an equally divided Court, 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971). In fact, 42 U.S.C.A. § 2000e–5(g), necessitates a finding of causation. That section reads in pertinent part:

"No order of the court shall require the admission or reinstatement of an individual as a member of a union or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended or expelled or was refused employment or advancement or was suspended or discharged *for any other reason than discrimination on account of race, color, religion, sex, or national origin,* or in violation of section 2000e–3(a) of this title." (Emphasis added)

Further, causation is expressly deemed to be an element of crucial im-

portance before an unlawful employment practice can be found to exist pursuant to 42 U.S.C.A. § 2000e–2(a)(1). That section provides:

> "(a) It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because* of such individual's race, color, religion, sex, or national origin. . . ." (Emphasis added)

■ The claimed injury in the matter at bar was the termination of plaintiffs as air hostesses because Continental violated Title VII with its "no marriage" rule. As indicated above, however, a nexus must be established between the discriminatory practice and the contended injury. *See e. g.*, Dewey v. Reynolds Metals Co., *supra.* In other words, plaintiffs, in order to come within the protective ambit of Title VII, must demonstrate that it was the "no marriage" policy which was the force behind their resignations. This nexus could be established by either showing that the actor's (Continental) *affirmative conduct* was a substantial factor in bringing about the claimed harm or that the injury was caused by *constructive action. See e. g.,* Montgomery Ward & Co. v. N.L.R.B., 377 F.2d 452, (6th Cir. 1967); N.L.R.B. v. Brennan's Inc., 366 F.2d 560 (5th Cir. 1966); N.L.R.B. v. J. W. Mays, Inc., 356 F.2d 693 (2nd Cir. 1966).

■ At first blush, a brief overview of the instant matter might indicate a constructive discharge. However, from a totality of the evidence and from the testimony elicited at trial it is abundantly clear that the plaintiffs' resignations from Continental were the product of their own volition and for reasons other than the existence of defendant's "no marriage" rule. The purpose of each of the voluntary resignations of plaintiffs was "marriage." The Court finds that the "no marriage" rule was not a substantial factor culminating in the resignations of plaintiffs.

The Court has heretofore found that the "single hostess" policy was not the cause of plaintiffs' resignations. In so holding, the Court views the issue of causation as pivotal to this action and views the failure to establish causation as a fatal flaw in plaintiffs' case. Had the Court found that causation had been established as to plaintiff Gerstle, however, that fact would not have altered the Court's conclusion as to her. The Court has found that the letter of May 3, 1966 coupled with an attorney's advice with respect to that letter, acted as a settlement of Gerstle's claims, if any, and that her re-employment in May of 1966 would have been a complete bar to this action foreclosing any relief.

This case came before this Court for trial after extensive pretrial proceedings before this and other courts. Gerstle v. Continental Airlines, Inc., 50 F.R.D. 213 (D.C.Colo.1970). The matter has resulted in prolonged litigation and after more than four years of its pendency, it is this Court's considered opinion that the case is now ripe for determination on the merits.

■ In interpreting Title VII with regard to the particular facts and issues raised herein, the Court recognizes that each case brought thereunder must be determined by the unique facts therein involved. Accordingly, the instant case is decided on the totality of the circumstances of the case and is not precedent for other unlawful employment practice charges in other factual situations. The ruling is limited to the facts of this case.

This opinion contains and shall constitute the findings of fact and conclusions of law required by Rule 52, Federal Rules of Civil Procedure.

### ORDER

The Court concludes that the issues are joined in favor of defendant and against plaintiffs and plaintiffs are not entitled to any relief.

Now, therefore, it is ordered, adjudged and decreed that the issues are joined in favor of defendant, Continental Airlines Inc., and against plaintiffs, Gerstle and Ciancio, and that judgment shall enter in favor of defendant and against plaintiffs and each of them.

It is further ordered that each party shall bear their own costs.

The ruling renders moot any further litigation in this action including the determination of the interest of defendant, Air Line Pilots Association, International, in regard to any of plaintiffs' loss or accrual of alleged seniority.