Willis Anderson LYGHT, Plaintiff,

v.

FORD MOTOR COMPANY, a Delaware
Corporation, Defendant.

Civ. A. No. 6–72521.

United States District Court,
E. D. Michigan, S. D.

Oct. 6, 1978.

Marvin D. Sharon, Detroit, Mich., for
plaintiff.

Kermit G. Bailer, Paul R. Caldwell, Jess
Womack, Dearborn, Mich., for defendant
Ford Motor Co.

## OPINION

FEIKENS, District Judge.

In this suit Willis Lyght, a black man,
charges that defendant Ford Motor Compa-

ny discriminated against him because of his race by failing to promote him from hourly to supervisory status between 1966 and April of 1973.

Until February of 1971 Ford required all supervisors (formerly foremen) to possess a high school diploma or its equivalent. Lyght himself was not considered for promotion for this reason until May of 1970. He claims that because blacks possess high school educations in lesser proportion than whites, this policy operated against him in a prohibited discriminatory fashion.

In May of 1970 Lyght acquired a General High School Equivalency Diploma. In May of 1971 he applied for a foreman's position. He was denied and claims that race was again the reason. Ford counters with the contention that at Lyght's facility, the Northville Valve Plant, no new foremen were hired between the time Lyght applied and April 4, 1973 when he was promoted at the Detroit Engine Plant.

For purposes of this opinion the plaintiff seeks back pay equal to the difference between what he has earned since first being wrongfully denied a promotion and what he would have earned had he been promoted when he should have. However, this case turns upon an important procedural issue that precludes consideration of the merits. The dispositive facts follow.

On January 19, 1973 Lyght filed a complaint (No. 17248–E6) with the Michigan Civil Rights Commission (MCRC) in which he alleged a continuing failure to promote him solely because he is black. The complaint was forwarded by mail to the Equal Employment Opportunity Commission (EEOC) on January 29 where it received the number TDT3–1035. Pursuant to its standard practice the EEOC deferred the handling of the claim to the MCRC.

The MCRC assigned the case to Maxie Cason, a Field Representative, on March 5, 1973. The Case Chronology reveals that Cason executed his duties diligently, spending many hours interviewing both the claimant and the respondent Ford and engaging in frequent telephone communications with them. It must be concluded that he became thoroughly familiar with the parties' respective desires pertaining to the resolution of the dispute at hand.

With Cason as an intermediary, the plaintiff and defendant worked toward a settlement. Their efforts soon bore fruit. A settlement reflected in the MCRC's adjustment of the dispute was secured. Under its terms Mr. Corsette, Ford's Supervisor of Salary Personnel Training and representative in this matter, agreed on Ford's behalf to allow Lyght to take the test Ford required of and administered to hourly workers who desired to become foremen. Lyght passed the test and on April 23, 1973 was promoted to foreman at the Dearborn Engine Plant, a facility related for some personnel purposes to the Northville plant. Ford also promised to consider Lyght for transfer back to Northville at the earliest opportunity and to increase the number of minority employees in the Northville operation's work force.

The MCRC thereupon prepared a summary and report acknowledging the settlement and closed the case with the notation "Satisfactory Adjustment." A "Notice of Disposition" was written upon which the "Closing Comment" read as follows: "It is recommended that this case be closed without back pay. The claimant is satisfied with the respondent [sic] actions." The Notice further explained that the value of the adjustment to the complainant was $1710 per annum, the amount of the pay increase attending the promotion.

These comments were, however, for internal use only and did not appear on the copy of the Notice mailed to Lyght. In an affidavit Cason stated that he did not believe that the Closing Comments should necessarily "be interpreted to mean that the claimant considered himself as fully vindicated when [the] complaint was closed." Lyght makes much of this as indicating that he did not voluntarily settle this claim. He also claims that for this reason he was under no obligation to notify the MCRC that he was not content with the results of its investigation. However, these claims must fail because in the Comments' stead

appeared the following excerpt from the Commission's Rules Relating to Reconsideration and Appeal.

Rule 7. (a) A claimant may request of the commission a reconsideration of its refusal to issue a charge. Any party may request a reconsideration of the terms of conciliation. Any such request shall be in writing, state specifically the grounds upon which it is based, and be filed within 30 days from the date of mailing of the notice of disposition of which reconsideration is requested. It shall be filed at any office of the commission by personal delivery or by registered or certified mail, return receipt requested.

(b) The commission in its discretion shall grant or deny the request for reconsideration. In either event, it may schedule a hearing thereon at such time and place and before such hearing commissioner or commissioners or hearing referee or referees as it may determine, and notice thereof shall be given to all parties to the proceeding . . . .

Rule 18. (a)

Any party or intervenor claiming to be aggrieved by a final order of the commission, including without limitation a refusal to issue a charge, may appeal to the circuit court of the state of Michigan having jurisdiction provided by law.

Lyght, it is presumed, read these materials, pertaining as they did to a matter of vital concern to him. The record shows, however, that he did not request the MCRC to reconsider its decision to close the case as "adjusted" nor did he manifest dissatisfaction with the settlement either to Ford or to the MCRC.

Illuminating further the circumstances attending the adjustment of Lyght's claim are several other highly pertinent pieces of evidence. On August 24, 1977 Ford deposed Lyght and therein appears the following colloquy. Regarding the results of the MCRC's investigation Lyght stated:

A: . . . when the MCRC settled with Ford Motor Company, one of the demands that was stipulated in the *agreement* was that when an opening did occur at the Northville Valve Plant, I would be considered for that position.

Q: Do you allege that there was a settlement with the MCRC by Ford Motor Company?

A: I don't know if the terminology is correct, but I got a statement that *to 'me I consider to be a settlement.* [emphasis added]

On following pages Lyght makes other statements which inferentially support the conclusion that a final resolution of his case had been effected through the MCRC's efforts and that he viewed it as such.

■ Lyght contends, however, that he was not satisfied with the adjustment, that he desired back pay at the time the settlement was reached and that this desire continued after the case was closed. Therefore, he claims, he was not party to a voluntary resolution and is not bound by its terms. For the following reasons I conclude that the facts of this case do not support him in this position.

Cason testified that it is the MCRC's standard practice in cases recommended for closing to note the claimant's dissatisfaction with the results of the investigation, if any, on the case file itself. In this case none is so noted; the Closing Comment is directly contrary. The standard practice thus belies his claim in this regard as does the substance of the closing comment itself. Moreover, Lyght's claim that the MCRC is not empowered to award back pay and that this is why he did not pursue the matter further is likewise belied by Cason's testimony that in a proper case the MCRC may order and secure back pay. This testimony is in harmony with Art. 5 § 29 of the Michigan Constitution which gives the MCRC broad powers to remedy claims of race discrimination.

An even more persuasive reason that Lyght's protestations of dissatisfaction with the settlement need not affect my finding that there was a voluntary and final settlement of this claim is apparent in the answer to the following query: What person has

not entered into an agreement or bargain with which he was not completely satisfied? The essence of the process of conciliation is that each party must make concessions he wishes were not necessary. In few cases settled before trial do both parties feel complete victory. Though Lyght may have been unhappy with the result of the negotiations, the onus was on him to in some way manifest his dissatisfaction. Without it, his silence for over two years in the face of what appeared to the other parties to be a final and satisfactory resolution of the dispute leads inexorably to the conclusion that Lyght acquiesced in and thereby ratified the adjustment.

The settlement of the first MCRC complaint was not the end of Lyght's efforts through the MCRC to ensure that Ford observed his rights. On October 2, 1973 a second MCRC charge was instituted, alleging Ford had breached one part of its agreement by denying Lyght a transfer from Detroit Engine back to Northville Valve while transferring a similarly situated white employee of lesser seniority. However, Lyght subsequently discovered that the other employee's seniority exceeded his own and that the transfer was therefore proper. Thus, he withdrew the complaint. No mention was made of any unresolved question of back pay stemming from the first complaint. This transaction further evidences that Lyght viewed the adjustment as an agreement to which Ford was required to adhere. It would be inequitable to allow Lyght to enforce the adjustment against Ford but escape its strictures himself.

The only evidence that Lyght manifested any dissatisfaction with the resolution of his 1973 claim is a letter addressed on April 17, 1976 to Lowell Perry, Chairman, EEOC in Washington, D.C., in which he refers to having contacted the EEOC four times over the preceding two years in an attempt to learn the status of the EEOC complaint corresponding to his first MCRC charge.[1] But again, this goes not to the issue of whether a settlement was reached but only shows that Lyght continued to pursue through the EEOC the relief from which I now hold he is barred.

On September 24, 1976 the EEOC belatedly issued a finding of "No Reasonable Cause" to believe that race discrimination had occurred, concomitant with a corresponding "Right to Sue" letter.[2]

To summarize, Lyght availed himself of the negotiation and conciliation services of the MCRC to facilitate the resolution of a race discrimination charge against Ford. The parties arrived at a settlement, back pay being noticeably absent.

Lyght was notified that if he desired further action he should notify the Commission. This he did not do; rather, he filed a second complaint *to enforce the results of the first.* Thereafter, he acquiesced, tacitly manifesting agreement with the settlement, casting doubt on his claim that he had not concurred. The deposition testimony does not undercut these findings. The "settlement" to which he there refers both denotes and connotes finality and agreement. The legal consequences of this finding of a voluntary settlement by Lyght are as follows.

Voluntary settlement is the keystone in Title VII's enforcement scheme. The EEOC was established to encourage and facilitate dispute resolution outside of the judicial forum. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1973). The statute states "the Commission shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion." 42 U.S.C. § 2000e–5(b). The Commission's policy of deferring to the state civil rights adminis-

---

1. Why the complaint was not removed from EEOC's agenda upon the MCRC's adjustment is not clear from the record. Neither Cason, Lyght nor Ford had any explanation. Lyght received on May 3, 1976 a letter informing him that the claim had been transferred to the Special Investigation and Conciliation Division and was awaiting disposition.

2. The "Right to Sue" letter applied also to the second EEOC charge involving the denial of transfer to Northville (TDT–40812).

trative bodies is a good example of how this policy has been implemented. 42 U.S.C. § 2000e–5(c).

The Supreme Court has acknowledged this policy, stating: "presumably an employee may waive his cause of action under Title VII as part of a voluntary settlement." [footnote omitted] *Alexander v. Gardner-Denver Co., supra*, at 52, 94 S.Ct. at 1021.[3]

The lower federal courts have extended the wisdom of the Supreme Court's analysis to a variety of circumstances. Perhaps the most forceful statement of the thinking which has evolved on this point is found in the *Allegheny-Ludlum* case, *supra*, 517 F.2d 858–9. There the Court stated:

> In no respect does footnote 14, or anything else in *Gardner-Denver*, support the assertion that an aggrieved employee who freely settles his or her unliquidated demand with the employer or the union may reciprocate by suing the same defendant at a later date on the same cause of action, merely because the employee grows dissatisfied with the payment for which he or she settled. Very frankly, we cannot conceive of how any employment discrimination dispute could ever be resolved outside, or indeed inside, the courtroom, if defendants were forbidden to obtain binding, negotiated settlements. No defendants would ever deliver money, promises, or any other consideration—not even a peppercorn—except after entry of a contested, final court order, and even this, on appellants' reasoning, might not end the matter. The EEOC and judicial caseloads would swell to chaotic dimensions. Industrial peace would be needlessly threatened. . . .

Other courts have extended this policy, upholding private dispute resolutions in a wide variety of circumstances. Some particularly illuminating instances bear discussion.

In *Strozier v. General Motors Corp.*, 442 F.Supp. 475, 481 (N.D.Ga.1977), the com-plaining employee accepted reinstatement and back pay in settlement of a wrongful discharge claim. The court held:

> Where an employee voluntarily and knowingly accepts settlement relief substantially equivalent to that obtainable under Title VII and Section 1981, he has waived his right to resort to the judicial forum to obtain additional relief under Title VII and Section 1981 if such additional relief is grounded upon the same alleged discriminatory conduct that forms the basis of the voluntary settlement.

Another informative case is *Gerstle v. Continental Airlines, Inc.*, 358 F.Supp. 545 (D.Colo.1973). There an assistant hostess supervisor was forced by her employer's rules to resign when she married. She thereafter filed a charge alleging sex discrimination with the EEOC and was subsequently issued a "Right to Sue" letter. She persisted, however, in her efforts to resolve the dispute without resort to the judicial forum and was successful when rehired as an assistant supervisor. As a condition of reemployment, her employer required her to drop the EEOC charge. She subsequently sent a letter to her employer in which she acknowledged the agreement. The court held "Her reemployment by Continental in May 1968 is a complete bar to this action and forecloses any relief." *Id.*, at 549.

The case of *Wilson v. Woodward Iron Co.*, 362 F.Supp. 886 (N.D.Ala.1973) adopts a theory of ratification on facts similar to those of the instant case. There the plaintiff was discharged, but with his union's aid negotiated reinstatement. Thereafter, he sought to reopen the matter in a Title VII suit. The court characterized the issue as "whether the plaintiff, having accepted reinstatement and vacation pay under the settlement, is now entitled to repudiate this agreement by claiming back pay for the period during which he was off from work." *Id.*, at 893. The Court held that because he had "accepted the benefits of the agreement by returning to work and accepting the payment of vacation pay [he had] there-

---

**3.** The referenced statement is arguably dictum. But it has been interpreted as establishing a general rule that Title VII claims may be voluntarily settled barring further claims based on the conduct that was the genesis of the settlement. *United States v. Allegheny-Ludlum Industries*, 517 F.2d 826, 858 (5th Cir. 1975).

by ratified the settlement agreement . . . [and] should not be allowed to accept the provisions of the settlement which were to his benefit and repudiate the provision which was to his detriment." *Id.*

■ The essential rationales of all these cases preserve the integrity of voluntary private settlements of civil rights claims. By accepting the benefits of the adjustment and *failing to make known his desire for* reconsideration or appeal Lyght has forfeited his right to reopen the issue at this late date.

■ In fairness to the plaintiff this case is, in some respects, distinguishable from those discussed above. It is different from *Strozier* in that here there is no express waiver and release signed by the complainant, Lyght. This settlement was not reduced to written form as was the case in *Gerstle, supra,* nor does it appear that Lyght was represented by an attorney during the time of the MCRC's efforts on his behalf as was the case in *Strozier.* Finally, in most of the cases there was some award of back pay to the aggrieved employee. However, in these distinctions lies the significance of this opinion. Back pay is not an essential element of an employee's recovery; no relief at all need result if the claim is without merit and yet the settlement might still be binding. *Allegheny-Ludlum* states that the relief must be substantially equivalent to that available under Title VII for a settlement to be binding. That requirement was met in this case.

■ As to the necessity of a written waiver or release, this too is not an inflexible requirement. What is required is that an agreement in fact be reached. That this may be established by evidence other than a signed document is a corollary to the reasoning through which I previously concluded that a settlement was in fact reached in this case.

The end served by a signed waiver requirement may be served equally by an inquiry into whether the plaintiff knowingly and voluntarily agreed. *E. g., Alexander v. Gardner-Denver, supra.* In this case, I find a voluntary and knowing agreement. Apprised of his right to appeal or obtain reconsideration, Lyght remained silent for over two years. He testified that he obtained a "settlement." Cason and Ford both believed he was satisfied. If this case differs from others, it is because it relies to a greater extent upon circumstantial rather than direct evidence. Lyght did not testify to an express agreement, yet the facts outlined above point thereto. Although civil rights cases must be scrutinized, ordinary principles of proof and logic are not suspended. Circumstantial evidence may here, as always, prove with force equal to direct.

Similarly, the knowing and voluntary, requirement may be established by the presence of an attorney during the negotiations, yet there is no talismanic quality in it. The plaintiff had access to and utilized the services of expert personnel at the MCRC.

And finally it should be stated that it is not only back pay to which *Allegheny-Ludlum* refers; rather, any promises or actions which the defendant was not under an obligation to make or do will suffice to give binding effect to the settlement.

The plaintiff asserts in his brief that the remedies afforded by administrative agencies and the federal judiciary are parallel and, in a sense, overlap. He claims that the ultimate responsibility for the enforcement of Title VII rests with the federal courts. *Alexander v. Gardner-Denver Corp., supra.*

He also cites cases for the proposition that the resort to a state or private adjudicative or administrative body does not preclude relief in the federal courts. See generally, *Cooper v. Philip Morris, Inc.,* 464 F.2d 9 (6th Cir. 1972).

I do not disagree with any of these assertions. All are valid. However, administrative and federal judicial remedies are only parallel in the sense that relief incapable of being awarded there or improperly denied there may be awarded in the federal court, and in the sense that a plaintiff is not bound by those determinations. But this is not a case for the application of those principles.

The MCRC did not "award" or "deny" relief. The parties, with the MCRC's aid, arrived at a settlement. Lyght bears the consequences of this act.

The federal court is exercising its supervisory function. Hearings have been held, briefs submitted and arguments heard for that purpose. This is "one of those rare instances in which the government has, to its satisfaction, successfully negotiated a . . . voluntary accord. At least ostensibly, the government has done precisely what it ought to do as a matter of public policy in order to vitiate the need for additional . . . litigation." *Allegheny-Ludlum, supra*, 517 F.2d at 848.

For the reasons set forth herein, judgment should be entered in defendant Ford's favor with respect to all claims that arise from the plaintiff Lyght's charge that until April 24, 1973 Ford failed to promote him to a foreman's position because of his race. Counsel for the plaintiff stated on the record in open court that if the 1973 promotions claim was decided against him he would have no case with respect to Ford's allegedly discriminatory failure since 1973 to promote Lyght from his current position to "General Supervisor." Therefore, this opinion is fully dispositive of Lyght's claims against Ford.