**Willis Anderson LYGHT,
Plaintiff-Appellant,**

v.

**FORD MOTOR COMPANY,
Defendant-Appellee.**

No. 79–1234.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 8, 1980.

Decided March 9, 1981.

■■■■■■■■■■■■■■■■■■■■■■

---

Marvin D. Sharon, Detroit, Mich., for plaintiff-appellant.

Richard J. Molloy, Kermit G. Bailer and Jess Womack, Dearborn, Mich., for defendant-appellee.

Before LIVELY and BOYCE F. MARTIN, Jr., Circuit Judges, and MARKEY,* Judge.

LIVELY, Circuit Judge.

This is an appeal from dismissal of an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The district court held that the action was barred by reason of an earlier settlement effected by the Michigan Civil Rights Commission (MCRC). *Lyght v. Ford Motor Co.,* 458 F.Supp. 137 (E.D.Mich.1978).

Willis Lyght has worked continuously for Ford since 1964. On January 19, 1973 he filed a complaint with the MCRC in which he charged that he had been denied a promotion on the basis of race. The facts of the alleged violation were stated as follows in his complaint:

> I have been employed by Ford Motor Car Company—Valve Plant since February 10, 1964. I am currently working as an inspector. I was promised a foreman's job three years ago, and I have been constantly denied it. When an opening comes up, they refuse to give it to me. In fact, just last week they brought a white foreman from the Dearborn Engine Plant to fill a vacancy. Out of more than 200 employees at the Valve Plant, there are only four blacks, including myself, and there are none in supervision.
>
> I am a black man and I believe that I have been denied a promotion solely on the basis of race.

The "complaint information" sheet which Lyght completed at the time of filing his first complaint with the MCRC asked, "What do you think a reasonable adjustment should include?" His answer was, "If proven that other men who made foreman at about the same time I submitted my application do not have a High School education, I feel I should get payed what I would have made if they hadn't kept me out for not having a High School Education."

On January 23, 1973 Lyght sent a copy of the complaint to the Detroit district director of the Equal Employment Opportunity Commission (EEOC). In his transmittal letter to the EEOC Lyght wrote, "I do not request that you take any action until the deferral period provided in Title VII for the Michigan Civil Rights Commission to act has expired." In acknowledging receipt of the copy of his complaint, the district director of EEOC wrote to Lyght:

> We will automatically assert jurisdiction over your charge on the 61st day after receipt by the state agency. If the state should earlier terminate its proceedings, or if the time limit set forth in the statute for the Commission to assert jurisdiction is about to expire, we will at that time assert jurisdiction.

Following an investigation the MCRC representative to whom the Lyght case was assigned recommended that the case be closed "as adjusted." The reason for the recommendation was stated in identical language both in an internal document containing the recommendation and in the "Notice of Disposition" ultimately issued by the MCRC on May 15, 1973:

> Subsequent to the completion of the investigation the respondent promoted the claimant to a foreman position at the Dearborn Engine Plant. The respondent states that when an opening occurs at the Northville Plant the claimant will be considered for transfer to that position. The respondent also agrees to increase the number of minority employees working at its Northville installation.

---

* The Honorable Howard T. Markey, Chief Judge, U.S. Court of Customs and Patent Appeals, sitting by designation.

The internal document, which neither Lyght nor Ford saw, contained the statement, "The claimant is satisfied with the respondent actions." The Notice of Disposition, which went to the parties, contained copies of rules of the MCRC relating to requests for reconsideration of the terms of conciliation and right of appeal to the circuit court.

In October 1973, after he had been promoted to the position of foreman and assigned to Ford's Dearborn engine plant, Lyght filed a second complaint with the MCRC charging breach of one part of the "adjustment" in Ford's failure to transfer him to the Northville plant though a white employee with less seniority had received such a transfer. This complaint was withdrawn when Lyght learned that the white employee actually had greater seniority. The second MCRC complaint did not charge any other violation of the terms of the adjustment or of Title VII. Lyght was not represented by an attorney in any of his dealings with the MCRC.

On March 27, 1974 the National Programs Division of the EEOC wrote Lyght that it was now ready to investigate his charge against Ford. He was asked to furnish further information by filing in an enclosed form. One question was whether he wanted EEOC to investigate his charge, and he was instructed to check the "no" box, "[i]f you have received a satisfactory settlement of your charge . . . ." Lyght filled in the form, requesting an EEOC investigation, and returned it to the national office. On April 17, 1976 Lyght wrote the chairman of EEOC asking the status of his case and when he might expect it to be resolved. In the letter Lyght stated that he had contacted the National Programs Division by telephone "over the past two years" and that no one seemed able to advise him.

On September 24, 1976 the EEOC made a determination of no reasonable cause to believe that Title VII had been violated in the manner alleged in Lyght's complaint. A notice of right to sue was sent to Lyght the same day, and this action was filed in the district court on December 7, 1976. In his district court complaint Lyght alleged that he first inquired about promotion to foreman in 1966 and was advised by Ford that a high school diploma was required. He charged that he first applied formally for promotion in March 1969 and that his application was rejected on this ground. He further charged that after he obtained a high school equivalency certificate, "G.E. D." in May 1970, he again applied and was turned down. A further application and denial in May 1971 were alleged. The complaint then set forth the fact that Lyght had filed a charge with the EEOC and "[t]hat the investigation on such charge was conducted by the Michigan Civil Rights Commission and resulted in Plaintiff's promotion to supervisor foreman." Ford's failure to promote Lyght between 1966, when he first inquired, and April 23, 1973, when he was promoted, was claimed to have been discriminately based on his race or color, in violation of Title VII and of 42 U.S.C. §§ 1981 and 1983. The prayer for relief was for an injunction restraining Ford from committing acts of discrimination and "from failing to pay to Plaintiff, the wages he would have earned but for the unlawful discriminatory acts of the Defendant[.]"

In its answer Ford denied that it had discriminated against Lyght. It stated that the requirement of a high school diploma or its equivalent for the position had been uniformly applied (this requirement was abolished at about the time Lyght qualified) and that no foremen had been appointed at Northville between August 1970, when Lyght received his G.E.D., and the time of his promotion. Ford also pled various affirmative defenses, including laches, limitations and business necessity. It did not plead settlement or waiver as an affirmative defense. Following a period of discovery Ford made a motion for summary judgment, supported by affidavits and a memorandum. There was no claim in any of these papers that Lyght was barred from proceeding in this action by reason of a settlement or waiver. A final joint pretrial statement listed the issues in the case. Again there was no mention of settlement or waiver. In a number of submissions to

the district court Ford took the position that Lyght's promotion was in no way related to his charge of discrimination. *E. g.*, Defendant's Answers to Plaintiff's First Request for Admissions, Record, Doc. # 22; Memorandum in Opposition to Motion for Order Compelling Discovery, Record, Doc. # 35.

At a hearing on Ford's motion for summary judgment held on September 6, 1978 the district judge, *sua sponte*, raised the issue of the settlement of Lyght's complaint by the MCRC. This occurred when the judge saw the entire MCRC file for the first time. It was agreed that the parties would brief the issue raised by the court, and the hearing was adjourned after taking the testimony of a witness for the plaintiff who had come from a distance. The parties did brief the question of the effect of the MCRC disposition. On separate days thereafter the testimony of Lyght and the MCRC representative who had handled his complaint was heard by the court. Ford produced no witnesses and at the conclusion of the testimony of the MCRC representative, Lyght's counsel stated that he had no further witnesses or submissions. The court took the matter under advisement and subsequently issued its opinion.

The parties are in disagreement as to the nature of the disposition made by the district court. Ford contends the court granted its motion for summary judgment while Lyght maintains the court granted a directed verdict. It is clear to us that the court did not grant summary judgment. It took extensive proof and made specific findings of fact. This is inconsistent with a grant of summary judgment. Though the district court did state in the first draft of its opinion, "a verdict should be directed in Ford's favor . . .," this was changed in the published opinion to read, "judgment should be entered in defendant Ford's favor . . . ." 458 F.Supp. at 143. This court concludes that the district court's disposition was an involuntary dismissal pursuant to Rule 41(b), F.R.Civ.P. This conclusion is consistent with a statement of counsel at the hearing on Ford's motion for summary judgment that they had agreed the motion would be treated as one for a "directed verdict." App. at 126. This being a non-jury case, the motion was in fact one for dismissal. The final order dismissed the case upon "a judgment of no cause of action." This reflected a final decision on a motion to dismiss made after the plaintiff had "completed the presentation of his evidence . . . ." Rule 41(b), F.R.Civ.P.

On appeal Lyght argues that the finding of the district court that he made a voluntary and final settlement with Ford in the MCRC proceedings was clearly erroneous and that it applied the wrong legal standard in determining what constitutes a "knowing and voluntary settlement." On the other hand, Ford maintains that all the findings of fact must be upheld since they are not clearly erroneous and that the district court properly concluded, as a matter of law, that Lyght's claim was barred "because he had voluntarily and knowingly accepted a settlement on terms substantially equivalent to the relief available under Title VII."

■ The record supports a finding that there was a settlement between the MCRC and Ford, and that Lyght accepted the benefit of it to the extent of his promotion and transfer. However, he did not receive any back pay for the period of alleged discriminatory refusal to promote him. Yet, as has been pointed out earlier, back pay was the "reasonable adjustment" he claimed in filing his MCRC complaint. The actual question in the case is whether the MCRC "adjustment" of Lyght's complaint was such as to preclude him from seeking back pay in a Title VII action. We conclude that the adjustment, or settlement, did not have this effect.

■ It is settled law that the doctrines of *res judicata*, collateral estoppel and election of remedies normally do not apply in Title VII actions. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 49–51, 94 S.Ct. 1011, 1020–1021, 39 L.Ed.2d 147 (1974); *Cooper v. Philip Morris, Inc.*, 464 F.2d 9 (6th Cir. 1972). In *Gardner-Denver* the Supreme Court held that an employee who claimed discrimina-

tion in employment practices was not foreclosed from exercising his statutory right to a federal court trial *de novo* under Title VII by reason of his prior submission of the same claim to arbitration under the nondiscrimination clause of a collective bargaining agreement. In reaching this conclusion, the Court found that the 1964 Act assigned "plenary powers" to the federal courts "to secure compliance with Title VII," 415 U.S. at 45, 94 S.Ct. at 1018, and noted a legislative scheme in other civil rights acts of according "parallel or over-lapping remedies against discrimination." *Id.* at 47, 94 S.Ct. at 1019 (footnote omitted). After remarking that Title VII provides for consideration of job discrimination claims in several forums, the Court concluded:

> And, in general, submission of a claim to one forum does not preclude a later submission to another. Moreover, the legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes. The clear inference is that Title VII was designed to supplement, rather than supplant, existing laws and institutions relating to employment discrimination.

415 U.S. at 47–49, 94 S.Ct. at 1019–1020 (footnotes omitted).

The Court in *Gardner-Denver* observed that "presumably an employee may waive his cause of action under Title VII as part of a voluntary settlement [15] . . . ." Footnote 15 pointed out that Alexander did not enter into a voluntary settlement "expressly conditioned" on waiver of his cause of action under Title VII and stated, "In determining the effectiveness of any such waiver, a court would have to determine at the outset that the employee's consent to the settlement was voluntary and knowing." 415 U.S. at 52, 94 S.Ct. at 1021.

In reaching its conclusion in the present case the district court relied principally on *United States v. Allegheny-Ludlum Industries, Inc.*, 517 F.2d 826 (5th Cir. 1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976). In *Allegheny-Ludlum*

the appeal was from denial of motions to vacate consent decrees entered in a "patterns and practices" action brought by the EEOC and the Secretary of Labor against nine steel companies. The consent decrees effected a nationwide settlement of claims of employment discrimination made on behalf of black, female and Hispanic employees. The court recognized the fact that employees who had not accepted the back pay provisions of the consent decree would be permitted to file private actions seeking individual awards. 517 F.2d at 848–49 & n. 26. However, it held that those who knowingly and voluntarily signed releases had waived the right to proceed independently for remedies covered by the releases. *Id.* at 853. The court found no support for the claim that "an aggrieved employee who freely settles his or her unliquidated demand with the employer or the union may reciprocate by suing the same defendant at a later date on the same cause of action, merely because the employee grows dissatisfied with the payment for which he or she settled." 517 F.2d at 858.

There are obvious differences between *Allegheny-Ludlum* and the present case. The most striking difference is that the appellants there had received back pay awards under the consent decrees and had signified their acceptance of these awards by signing releases which incorporated the terms of the consent decrees. In the present case Lyght signed no release and the MCRC proceedings were terminated by an order of the commission closing the complaint, not by a consent decree. And, of course, Lyght received no back pay under the order of adjustment. Lyght's Title VII suit cannot be characterized as the action of one who sued merely because he became dissatisfied with the payment for which he settled. Lyght appears to be more nearly in the position of those steel industries employees who declined to accept the back pay provisions of the consent decrees and refused to sign releases than the position of the appellants in *Allegheny-Ludlum*. In *Watkins v. Scott Paper Co.*, 530 F.2d 1159 (5th Cir.), *cert. denied*, 429 U.S. 861, 97 S.Ct. 163, 50 L.Ed.2d 139 (1976), the court discussed

*Gardner-Denver* and its previous decision in *Allegheny-Ludlum.* It concluded that "waiver of a federal remedial right is not lightly to be inferred [19] ...." Footnote 19 states:

> [19] In *Alexander v. Gardner-Denver Co.*, 1974, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147, the Supreme Court held that an employee did not waive Title VII rights by first submitting a claim of discrimination to arbitration under a collective bargaining agreement. To be sure, the Court recognized that it was possible for an individual employee to waive Title VII rights as part of a voluntary settlement. *Id.* at 52 & n. 15, 94 S.Ct. at 1021, 39 L.Ed.2d at 160, *see United States v. Allegheny-Ludlum Indus., Inc.*, N.D.Ala. 1974, 63 F.R.D. 1, 7, *aff'd*, 5 Cir. 1975, 517 F.2d 826. Nonetheless, the Supreme Court observed that there was no voluntary settlement "expressly conditioned on a waiver" of the employee's Title VII cause of action. 415 U.S. at 52 n. 15, 94 S.Ct. at 1021, 39 L.Ed.2d at 160. This observation impliedly requires a degree of specificity in Scott's waiver form, if that form is to have the effect Scott desires, that does not exist. Moreover, the Court also observed that the mere existence of an express waiver would be, of itself, insufficient to show actual waiver. In addition, it would be necessary to show, "*at the outset*", that the waiver was "voluntary and knowing". *Id.* (emphasis added).

530 F.2d at 1172–73. *See also Cox v. Allied Chemical Corp.*, 538 F.2d 1094, 1098 (5th Cir. 1976), *cert. denied*, 434 U.S. 1051, 98 S.Ct. 903, 54 L.Ed.2d 804 (1978).

The other cases relied upon by the district court are also distinguishable. In *Strozier v. General Motors*, 442 F.Supp. 475 (N.D.Ga. 1977), *app. dismissed*, 584 F.2d 755 (5th Cir. 1978), the court found that the plaintiff had settled each of the grievances filed by him in connection with the disciplinary actions which were the basis of his Title VII action. As a result of these settlements the plaintiff had been reinstated and had received and accepted back pay. The court found that the settlement relief was "substantial-ly equivalent to that obtainable under Title VII ...," 442 F.Supp. at 481, and granted a summary judgment for the defendant. In determining that the settlement was voluntarily and knowingly made the court specifically noted that the plaintiff was represented by counsel at the time the last settlement was reached and accepted. *Id.* In *Gerstle v. Continental Airlines, Inc.*, 358 F.Supp. 545 (D.Colo.1973), the plaintiff, with advice of her attorney, signed an agreement, one term of which was that she would drop her pending charge against her employer. The court found that "[t]he agreement by its terms unequivocally settled all claims." 358 F.Supp. at 548. *Wilson v. Woodward Iron Company*, 362 F.Supp. 886 (N.D.Ala.1973), was brought under 42 U.S.C. § 1981, not Title VII. The plaintiff put his claim in the hands of a union attorney who settled it with the employer's attorney. The plaintiff was reinstated and received lost vacation pay, but no back pay. In his § 1981 case he contended that the agreement should have been approved by his personal attorney, something he never sought at the time of the settlement. The district court stated that the plaintiff should not be permitted to accept the benefits of the settlement and later repudiate the terms which were not in his favor. Nevertheless, the court proceeded to decide the case on its merits and found no unlawful discrimination had taken place.

In all of these cases it appears that the plaintiff or his attorney negotiated settlements which were formalized by consent decrees, written releases or signed settlement agreements, specifically waiving the right to future litigation. In this case the plaintiff had no attorney and did not engage in any settlement negotiations. Lyght signed nothing and was never told that his right to proceed under Title VII was waived. He was merely advised by the MCRC that his complaint had been closed as adjusted. Lyght had filed his complaint with the EEOC as well and had been informed by that agency that it would "assert jurisdiction" on the 61st day after the com-

plaint's receipt by the state agency. The March 27, 1974 letter to Lyght from the EEOC confirmed that this agency was still in the case.

The court concludes that the MCRC settlement based on Lyght's promotion does not preclude him from seeking back pay in this Title VII action. Though Title VII evinces a congressional preference for conciliation over litigation, the fact remains that a person who claims injury from discrimination in employment practices is entitled to a hearing in a federal court. *Cooper v. Philip Morris, Inc., supra,* 464 F.2d at 10–11. We agree with the Fifth Circuit that waiver of such a federal remedial right is not lightly to be inferred. It is clear in this case that "petitioner [Lyght] and respondent [Ford] did not enter into a voluntary settlement expressly conditioned on a waiver of petitioner's cause of action under Title VII." *Gardner-Denver, supra,* 415 U.S. at 52, n. 15, 94 S.Ct. at 1021, n. 15. Though the MCRC adjustment may fairly be treated as a knowing and voluntary partial settlement by Lyght in view of his acceptance of the promotion and subsequent transfer, it is insufficient to constitute a waiver of his right to seek a complete remedy in a federal court, on the basis of his still pending complaint before the EEOC.

In the course of proceedings the district court also dismissed the claims of Lyght under 42 U.S.C. §§ 1981 and 1983. Lyght has not appealed these dismissals. On remand the narrow issue remains whether Ford violated Title VII in not promoting Lyght before April 23, 1973. Only if the district court finds such a violation will it be necessary to consider Lyght's further claim that Ford discriminated against him after April 23, 1973 by not promoting him to general foreman. It was conceded by counsel that the later charge would fail if he was unable to prevail on the earlier one. App. at 128–30.

The judgment of the district court is vacated and the cause is remanded to the district court for further proceedings. The appellee will pay costs on appeal.