*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0195p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MARCIA B. NANCE,

    *Plaintiff-Appellant,*

  *v.*

            No. 06-6563

THE GOODYEAR TIRE & RUBBER COMPANY,

     *Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 04-01307—James D. Todd, District Judge.

Argued: October 31, 2007

Decided and Filed: May 23, 2008

Before: BATCHELDER, MOORE, and COLE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Carolyn J. Chumney, Memphis, Tennessee, for Appellant. Herbert E. Gerson, FORD & HARRISON, LLP, Memphis, Tennessee, for Appellee. **ON BRIEF:** Carolyn J. Chumney, Memphis, Tennessee, for Appellant. Herbert E. Gerson, Timothy S. Bland, Thomas J. Walsh, Jr., FORD & HARRISON, LLP, Memphis, Tennessee, for Appellee.

  COLE, J., delivered the opinion of the court, in which MOORE, J., joined. BATCHELDER, J. (pp. 16-20), delivered a separate opinion concurring in the judgment.

---

## OPINION

---

  R. GUY COLE, JR., Circuit Judge. Plaintiff-Appellant Marcia B. Nance appeals the district court's grant of summary judgment to Defendant-Appellee Goodyear Tire and Rubber Co. ("Goodyear") on her claims alleging violations of the Americans with Disabilities Act, the Tennessee Handicap Act, and the Family and Medical Leave Act; retaliatory discharge, including violations of the Tennessee "whistleblower" law; wrongful and constructive discharge through alleged retaliatory conduct; outrageous conduct and intentional infliction of emotional distress in violation of Tennessee common law; and breach of a common law duty of good faith and fair dealing. For the following reasons, we **AFFIRM** the judgment of the district court.

1

# I. BACKGROUND

## A.

Goodyear hired Nance on June 22, 1998, as a bargaining-unit employee in its Union City, Tennessee tire-manufacturing plant. Nance was initially employed in a bead-builder position, which requires the assembly of steel wires called "beads" that attach a tire to the wheel rim.

On November 15, 2000, Nance successfully bid under the collective bargaining agreement ("CBA") for a roll-changer position, which required her to load rubber strips onto a splicing machine. While working in that capacity, Nance injured her neck and shoulder and was diagnosed with cervical radiculopathy. On May 15, 2002, Nance's physician, Dr. William H. Knight, performed bone-fusion surgery on her cervical vertebrae by removing a bone from her hip and fusing it with two of the vertebrae in her neck. As a result of her injury, Nance took a medical leave of absence for approximately a year, from May 2002, the time of her surgery, until March 2003.

In anticipation of Nance's eventual return to work in 2003, Dr. Knight and a workers' compensation representative from Goodyear, Rebecca Duke, requested a functional capacity evaluation ("FCE") for Nance primarily to determine whether she could resume the roll-changer position she held before her injury. For several hours over a two-day period (February 3-4, 2003), Jacqueline Gilliam, a Goodyear physical therapist, performed a complete examination of Nance. The tests Gilliam conducted showed that Nance could lift a maximum of thirty pounds from the floor, twenty pounds overhead, and thirty pounds horizontally; that she could carry a maximum of twenty pounds in her right hand, twenty pounds in her left hand, and twenty-five pounds in both hands; that she could generate a forty-six to fifty-four pound "push-pull force;" and that she had a grip strength of seventy-three pounds in the right hand and seventy-seven pounds in the left hand. According to Gilliam, this meant Nance could tolerate "positional activities such as elevated work, forward bending, sitting and standing on a frequent basis, as well as rotational sitting . . . rotation in standing, crawling, kneeling, crouching, repetitive squatting, sitting and standing, walking, stair climbing, step ladder climbing, balancing, and coordination." (Joint Appendix ("JA") 512.) However, Nance's injury limited "[v]ertical ladder climbing and material handling abilities." (JA 266.) Officially, she was placed in the "Light and Medium" Physical Demand Category because she was unable to lift weight continuously.

Comparing the physical demands of the roll-changer position and the FCE results, Gilliam concluded that Nance could not physically perform her duties in that position. Goodyear therefore disqualified Nance as a roll changer. After Nance's FCE, Gilliam searched all bargaining-unit jobs in the Goodyear plant and reported that none matched Nance's physical abilities. Following this report, Nance met several times with Union and Goodyear representatives to discuss further efforts to identify a position which she could perform. Nance and the various representatives reviewed lists of jobs in the plant, considering Nance's limits and each job's physical requirements. During these ongoing accommodation efforts, Gilliam learned that Nance was qualified and eligible to work as a stock trucker, which would require her to drive fork-lift trucks to transport materials within the plant. By letter of May 22, 2003, Gilliam opined to Human Resources representative Kathy Hill that Nance could perform the duties of that job.

Nance returned to work as a stock trucker on June 16, 2003. After a few weeks, Nance removed herself from that position because she claimed that Goodyear did not accommodate her physical limitations in a number of areas, and that vibrations from the fork-lift caused pain in her neck and shoulder. According to Nance, Goodyear failed to provide her with a strong arm-lift support to help her lift the side panel off the fork-lift to change the battery, a radio to communicate with her co-workers, or assistance from her co-workers to help change the battery. Her disqualification as a stock trucker became official at a meeting on October 3, 2003, at which Nance,

a union steward, and two Goodyear representatives were present. Nance did not file a grievance over her disqualification, and she remained off work on another period of medical leave related to a hysterectomy performed on July 23, 2003.

On October 28, 2003, Gilliam re-analyzed the job tasks associated with the "Banbury" mixer machine-cleaner. Gilliam originally deemed Nance medically incapable of performing this job, but upon a second review, she concluded that Nance could perform the job if Goodyear implemented certain accommodations. The Banbury mixers produce the rubber compounds used in tires and, during their operation, discharge a steady trickle of oil down a trough and into a five-gallon bucket. Machine cleaners in the Banbury area are normally responsible for keeping the premises clean and free of debris. One of the responsibilities of a machine cleaner is to empty the bucket as needed, usually by carrying the bucket containing the discharged oil down an aisle and pouring it into a drum. The position is an established bargaining-unit position held at any given time by approximately eleven to fifteen Goodyear employees, working in three shifts over a twenty-four hour period. To accommodate Nance's lifting restrictions, Gilliam proposed adjusting some of the machine-cleaner duties and suggested the creation of special tools like a hand-held scoop, which Nance could use to remove oil from the bucket incrementally rather than waiting for it to become completely full. Gilliam also recommended that Goodyear give Nance a smaller scraper than those normally used to clean "fine baskets," containers that must be cleaned once every shift. Following Gilliam's recommendation, on November 3, 2003, Goodyear placed Nance in the machine-cleaner position. She was given a ladle consisting of a coffee can welded to a rod to remove oil in smaller increments and two teflon-coated pans to scoop out sludge from the oil buckets as needed. Goodyear also added a hook onto the side of the pans to eliminate the force necessary for emptying them.

Nance worked as a machine cleaner for four days, last reporting to work on November 7, 2003. According to Nance, she left the job because Goodyear did not permit her to perform the other parts of the machine-cleaner job, and instead limited her to emptying the oil buckets; because Goodyear refused to replace a safety gate and provide adequate lighting; and because she found the job mentally difficult. She also claimed that the position was neither meaningful nor safe.

After Nance left work, Dr. Louis M. Wells, her psychiatrist, diagnosed her on December 15, 2003, with adjustment disorder with mixed emotional features, panic disorder, and agoraphobia, an anxiety disorder involving the fear of certain settings that may present unexpected challenges or demands. As a result of his diagnosis, Dr. Wells wrote a note requesting that Nance be excused from work through January 6, 2004, when she was to be reevaluated. Shortly thereafter, Hill sent Nance a letter advising her that Goodyear was placing her on a medical leave of absence for her stated inability to work. Hill's letter reminded Nance that she was "responsible for reporting off to [her] resident department while [she was] on medical leave of absence."[1] (JA 284.)

In the midst of all this, on January 9, 2004, Nance, her attorney Timothy Boxx, Goodyear's workers' compensation manager Jane Holland, and Goodyear attorney James Glasgow, Jr., met in an attempt to settle Nance's workers' compensation claims from her 2002 injury. In a discussion after the conference, Boxx contends that he told Holland that Nance would not return to work,

---

[1]Goodyear argues on appeal that Nance's medical leave expired on January 7, 2004. Dr. Wells filled out a Family and Medical Leave Act form on Nance's behalf, dated January 6, 2004, indicating that Nance's current medications had resolved the previously diagnosed panic attacks and agoraphobia and that her current disability was not due to a psychiatric condition. However, Dr. Wells left blank the line asking, "When should patient be able to return to work?" At the very least, even if she was capable of returning to work after January 6, 2004, it is undisputed that at the time Goodyear concluded that she "resigned without notice," Goodyear had technically placed her on "Employment Roll," which is reserved for inactive employees on extended leaves of absence. We therefore assume for the purposes of this appeal that Nance was on a medical leave of absence at the time Goodyear removed her from the company.

though Nance claims that Boxx stated only that she would not return to the machine-cleaner position.

After January 9, 2004, Nance did not return to work, nor did she call in to report her absences. A few weeks later, on January 29 and 30, 2004, Lee McClure, then Goodyear's business center auditor for the plant's Banbury area, attempted to reach her at her home by telephone. The first time he left a voice message which Nance said she did not receive. On January 30, Nance picked up, but she told McClure that she "could not talk to him . . . [a]nd [] hung up the phone." (JA 224.) Although Nance admits that she made no effort to call McClure back, she believed that Goodyear would send her a certified letter containing any information the company needed to convey. However, Goodyear viewed this interaction differently. Due to failed attempts to contact Nance, and her continuing absences, Goodyear sent her a letter dated February 19, 2004, and a Separation Notice dated February 23, 2004, advising Nance that she was being discharged from the company pursuant to Article X of the CBA. Article X states, in relevant part:

> An employee who is absent for seven (7) scheduled work days or more, without reporting to the Employer, shall be considered as having resigned without notice and his seniority will terminate.

After receiving the termination notices, Nance called Union and Goodyear representatives on March 2, 2004, to protest Goodyear's conclusion that she had "resigned without notice." On March 3, 2004, the Union filed a grievance disputing her termination, which eventually culminated in arbitration.

**B.**

On June 16, 2004, Stanley H. Sergent presided as the arbitrator over a full evidentiary hearing. Nance was represented at the hearing by four Union representatives, and five witnesses testified under oath, including Nance and her attorney, Boxx. Two weeks after the hearing, Sergent entered an Opinion and Award holding that Goodyear had properly treated Nance as having "resigned without notice" under Article X of the CBA. He found that Nance had not justified her failure to comply with the report-off requirement of Article X and concluded that "since [Goodyear] properly considered the grievant as having resigned without notice her grievance is without merit and must be denied." (JA 415.)

Nance then filed the present action on November 22, 2004, alleging discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Tennessee Handicap Act ("THA"), Tenn. Code Ann. § 8-50-103; violations of the Family and Medical Leave Act ("FMLA"), 28 U.S.C. § 2601 *et seq.*; retaliatory discharge, including violations of the Tennessee "whistleblower" law, Tenn. Code Ann. § 50-1-304; wrongful and constructive discharge through alleged retaliatory conduct; outrageous conduct and intentional infliction of emotional distress in violation of Tennessee common law; and breach of a common law duty of good faith and fair dealing.

After Goodyear moved for summary judgment, the district court granted all of Goodyear's claims, finding itself "bound by the arbitrator's decision that, pursuant to the terms of the CBA, Plaintiff resigned without notice from her employment instead of being terminated," and concluding that Nance was "barred from re-litigating the issue of her alleged wrongful discharge." (JA 1187.) The district court also found the remaining state law claims to be without merit. After the district court entered an order denying Nance's motion to alter or amend the judgment, Nance filed this appeal.

## II. STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment. *Miller v. Admin. Office of the Courts*, 448 F.3d 887, 893 (6th Cir. 2006). Summary judgment for Goodyear is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). However, Goodyear bears the burden of proving that there are no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The ultimate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## III. ADA CLAIMS

Nance's disability discrimination claims present two distinct inquiries. First, as a threshold matter, did the arbitration regarding whether Nance violated the terms of the CBA preclude her from re-litigating that issue in a related suit to vindicate her statutory rights under the ADA? If it did not, and we are allowed to consider the question, is Goodyear nevertheless entitled to summary judgment on the merits?

### A.

Nance contends that the district court erred in finding that her ADA claims were barred by the arbitrator's conclusion that she had "resigned without notice," and points to *Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974), for the proposition that the arbitration of related contractual claims under a CBA does not bar de novo review of statutory claims in federal court. We agree. Generally, "once an issue has been fully litigated and necessarily determined by an adjudicatory body, a party and its privies are precluded from raising that issue in a subsequent proceeding." *Central Transp., Inc. v. Four Phase Sys., Inc.*, 936 F.2d 256, 260 (6th Cir. 1991). However, when an employee like Nance submits her grievance to arbitration, she is seeking only to vindicate her contractual rights under a collective bargaining agreement. Such an employee is not barred from bringing a subsequent statutory claim against her employer based on the same conduct, because arbitration over contractual disputes under a collective bargaining agreement is of a "distinctly separate nature" than "independent statutory rights accorded by Congress." *Alexander*, 415 U.S. at 49-50. Not only are the two forums independent, but they are in fact, according to the Court, "complementary since consideration of the claim by both forums may promote the policies underlying each." *Id.* at 50-51. In sum, an employee should be able to "pursue fully both his remedy under the grievance-arbitration clause of a collective bargaining agreement and his cause of action under Title VII," and a "federal court should consider the employee's claim de novo." *Id.* at 59-60. *See also Wright v. Universal Mar. Serv. Corp.*, 525 U.S. 70 (1998) (holding that a collective bargaining agreement's general arbitration clause did not encompass an alleged violation of the ADA); *McDonald v. City of West Branch*, 466 U.S. 284 (1984) (applying *Alexander* to § 1983 claims); *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728 (1981) (same for the Fair Labor Standards Act).[2]

---

[2] The logic behind allowing de novo review of statutory rights is that arbitration under a collective bargaining agreement vindicates collective, contractual rights, whereas federal courts protect individual statutory rights. However, while *Alexander* stands for the proposition that the vindication of rights pursuant to statute is not precluded by res judicata, an employee may not be able to proceed with pendent state law claims (such as Nance's claim that Goodyear violated the duty of good faith and fair dealing). Either way, we need not decide this issue since, as will be explained below, summary judgment for Goodyear is appropriate.

Goodyear argues, and the district court agreed, that *Alexander* and its progeny are distinguishable because Nance only arbitrated the question of whether she had resigned without notice as defined by Article X of the CBA. To be sure, *Alexander* differs from the instant case in that Alexander submitted both his discrimination and contract claims to arbitration whereas Nance's grievance involves only a contractual claim. The question, then, is whether a prior arbitration over a contractual issue precludes (or "collaterally estops") a plaintiff from re-litigating that same issue in federal court. We think not.

In *Alexander*, the Supreme Court held "that the federal policy favoring arbitration does not establish that an arbitrator's resolution of a contractual claim is dispositive of a statutory claim under Title VII." 415 U.S. at 46 n.6. Like Nance, Alexander was a former African-American employee who filed both a claim of wrongful discharge under his collective bargaining agreement's grievance provisions and a statutory race-discrimination claim in federal court. While Alexander's Title VII claim was pending, an arbitrator ruled that he had been discharged for "just cause" because he produced too many defective or unusable parts, though the arbitrator made no express reference to his claim of racial discrimination. The district court determined that the arbitrator's decision precluded the court from reconsidering the issue, and granted summary judgment in favor of the defendants. The Tenth Circuit affirmed. The Supreme Court then reversed and concluded that courts should not defer to a prior arbitration even if the arbitrator has the full authority to rule on the claim and the court is presented with the same question as the arbitrator.

We find it difficult to distinguish this case from *Alexander*. In *Alexander*, the Court considered whether an adverse arbitration decision finding that Alexander was fired for "just cause" had a preclusive effect, and here, we consider whether an adverse arbitration decision finding that Nance "resigned without notice" has a preclusive effect. Both cases involve the adjudication of statutorily guaranteed rights, an inquiry that Congress reposed in federal courts.

This is also not the first time this Circuit has confronted and answered this question. In *Becton v. Detroit Terminal of Consol. Freightways*, 687 F.2d 140, 141-42 (6th Cir. 1982), the plaintiff, a discharged employee, appealed the district court's conclusion that a prior arbitration on whether the employee had been fired for "just cause" precluded a federal court from considering evidence on the underlying racial-discrimination claim. We concluded that the district court engaged in "an impractical and excessively narrow application of [*Alexander*]," *id.* at 142, because "[t]here is no realistic way to sever the discharge from the claim of discrimination," *id.* "Inasmuch as 'just cause' or similar contract questions are an integral part of many discrimination claims, the better rule avoids judicial efforts to separate and classify evidence offered by the plaintiff under the heading of 'discrimination' or 'just cause.'" *Id.*

The key point in this line of cases is clear: While the expertise of arbitrators lies in the application of facts to the terms of an employee's contract or collective bargaining agreement, the expertise of federal courts lies in the application of facts to anti-discrimination statutes. In other words, because "the specialized competence of arbitrators pertains primarily to the law of the shop, not the law of the land," *Alexander*, 415 U.S. at 57, whether Nance resigned without notice might mean one thing under Goodyear's CBA, but it might very well mean an entirely different thing for the purposes of an "adverse employment action" under the ADA. Thus, the legal *and* factual issues raised in Nance's ADA claim are beyond the competence of the ordinary arbitrator whose primary expertise concerns "the demands and norms of industrial relations." *Id.*

But even assuming that the resignation versus termination question is a purely contractual issue, and requires no *substantive* expertise from federal courts, the importance of strict fact-finding procedures in protecting the rights guaranteed under the ADA is another convincing reason for this rule. Arbitration does not carry with it the right to a trial by jury, arbitrators are not generally required to give the reasons for their decisions, the record of arbitral proceedings generally is not

as complete as a trial record, judicial review of arbitration decisions is more limited than review of district court proceedings, the Federal Rules of Evidence and of Civil Procedure do not apply, and other rights such as testimony under oath, cross-examination, discovery, and compulsory process are restricted. *Id.* at 57-58. When an employee such as Nance seeks to vindicate her federal rights to be free from discrimination, we must review all factual issues—including contractual ones—de novo in order to ensure that "the interests of the individual employee [are not] subordinated to the collective interests of all employees in the bargaining unit." *Id.* at 58 n.19; *see also Barrentine*, 450 U.S. at 742-43. In short, where suits are tried is often as important as the substantive rights sought to be vindicated. Thus, whether the arbitration is "similar to, or duplicative of, the substantive rights secured by [the ADA]," *Alexander*, 415 U.S. at 54, if a plaintiff does not expressly waive her right to bring claims in federal court, a prior arbitration does not preclude us from reconsidering all factual issues underlying a statutory claim.

One final point: although we review Nance's ADA claim de novo, we do not read *Alexander* as precluding courts from considering a prior arbitration as a factor in their calculus. Indeed, a district court may admit an arbitrator's decision as evidence based on "the degree of procedural fairness in the arbitral forum, adequacy of the record with respect to the issue of discrimination, and the special competence of particular arbitrators," or when "the issue is solely one of fact, specifically addressed by the parties and decided by the arbitrator on the basis of an adequate record." *Id.* at 60 n.21.[3]

## B.

Before moving on to consider the merits of Nance's ADA claim, we pause to address the arguments set forth in the concurring opinion.

First, the concurrence disputes the proposition that Supreme Court precedent forbids us from applying collateral estoppel to issues decided by an arbitrator while interpreting a collective bargaining agreement. The concurrence accuses us of overgeneralizing and mischaracterizing the Supreme Court's rulings. To the contrary, all we have done is follow exactly what the Supreme Court has said. In *Alexander*, the Court noted that "[t]he policy reasons for rejecting the doctrines of election of remedies and waiver in the context of Title VII are equally applicable to the doctrines of res judicata *and collateral estoppel*." 415 U.S. at 49 n.10 (emphasis added). In *McDonald*, the Court reiterated and extended its reasoning in *Alexander* and *Barrentine* to the § 1983 context. The *McDonald* Court held "that in a § 1983 action, a federal court should not afford res judicata *or collateral-estoppel* to effect an award in an arbitration proceeding brought pursuant to the terms of a collective-bargaining agreement." 466 U.S. at 292 (emphasis added). Our sister circuits have read the Supreme Court's language just as we have, presumably because it is clear and unambiguous. *See, e.g.*, *Wiedemann v. City of Oklahoma City*, 76 F. App'x 931, 932 (10th Cir. 2003) (declining to give preclusive effect to an arbitrator's determination that the defendant failed to proffer a legitimate, non-discriminatory reason for terminating plaintiffs, and citing *McDonald* in support); *Grappe v. Kansas City S. Ry. Co.*, 71 F. App'x 302, 303 (5th Cir. 2003) ("[B]ecause different policies underlie the proceedings before the Board and the Title VII action before the court, collateral estoppel is not available."); *Williams v. Perry*, No. 00-7366, 2000 WL 1506086, at *5-7

---

[3] The concurring opinion questions the "admissibility [of the arbitrator's decision] in this case on an evidentiary basis, as this 'evidence' is almost certainly hearsay." Concurring Op. at 19. Assuming that the Supreme Court failed to consider this issue, an assumption we find dubious since the Court approved of this approach after the enactment of the Federal Rules of Evidence, *McDonald*, 466 U.S. at 292 n.13, this hardly seems to be an argument in favor of giving a prior arbitration preclusive effect. If arbitration presents serious reliability problems from the use of hearsay, then the trial court should be able to accept or reject that evidence based on the degree of procedural fairness in the arbitral forum. *See Jackson v. Bunge Corp.*, 40 F.3d 239, 246 (7th Cir. 1994); *Perry v. Larson*, 794 F.2d 279, 284-85 (7th Cir. 1986).

(2d Cir. Oct. 6, 2000) (declining to give preclusive effect to an arbitrator's finding that the plaintiff was discharged for "just cause" on the basis of *McDonald*); *Wilmington v. J.I. Case Co.*, 793 F.2d 909, 918 (8th Cir. 1986) (holding that an arbitrator's ruling that the plaintiff had been fired for just cause for falsifying labor cards did not have preclusive effect on a subsequently filed § 1981 claim); *Gonzalez v. S. Pacific Transp. Co.*, 773 F.2d 637, 643 (5th Cir. 1985) ("Even if the same claim and factual allegations were determined by binding arbitration, the plaintiff is entitled to *de novo* review in a federal court and doctrines of *res judicata* or collateral estoppel are inapplicable."); *Aleem v. Gen. Felt Indus., Inc.*, 661 F.2d 135, 137 (9th Cir. 1981) ("Collateral estoppel is equally inapplicable, for Congress in enacting Title VII made it clear that prior administrative adjudications were not to prevent de novo review of Title VII claims in federal court. The statutory scheme warrants an exception to the usual rules of res judicata and collateral estoppel."); *Lyght v. Ford Motor Co.*, 643 F.2d 435, 438 (6th Cir. 1981) ("It is settled law that the doctrines of res judicata, collateral estoppel and election of remedies normally do not apply in Title VII actions.").

The concurrence is, of course, free to make what it will of Supreme Court precedent, but we think it prudent to follow that precedent, just as our sister circuits have, until the Court commands otherwise. *United States v. Hill*, 440 F.3d 292, 299 n.3 (6th Cir. 2006) (stating that the lower federal courts must apply Supreme Court precedent, even if they have doubts about its continuing viability, because it is the prerogative of the Supreme Court alone to reverse its decisions). We also cannot help but to notice that even though the concurrence insists that the Supreme Court has not foreclosed the application of collateral estoppel to issues decided by an arbitrator in a subsequent civil-rights action, the concurrence does not cite a single decision from any court doing just that. The reason for this is simple: there are none.

Even if there were some reason to assume that the Supreme Court did not mean what it said in *Alexander* and *McDonald*, we are not persuaded by the concurrence's arguments in support of its position. The concurrence contends that if we fail to defer to an arbitrator's interpretation of a collective bargaining agreement, we risk unleashing the evil of collateral attacks on prior judgments, and the inconsistent rulings and advisory opinions that such collateral attacks could spawn. To illustrate, the concurrence asks us to imagine what would happen if Nance appealed the arbitral decision against her, we affirmed, and Nance then filed her ADA action. The concurrence says that in such a situation, our failure to give preclusive effect to the arbitrator's finding that Nance resigned without notice would effectively authorize a collateral attack on our prior (imaginary) decision affirming the arbitral decision. This, in turn, says the concurrence, would render our prior decision merely advisory.

We think our concurring colleague is unnecessarily alarmed. To believe that our opinion today will license collateral attacks as the concurrence fears, one would have to believe that the question presented on appeal from an arbitrator's decision interpreting a collective bargaining agreement, and the question presented on appeal from a district court's decision adjudicating a civil-rights claim, are identical. But as *Alexander* and its progeny have explained in no uncertain terms, they are not. Indeed, claims predicated on a collective bargaining agreement and claims predicated on federal statutes "have legally independent origins," *Alexander*, 415 U.S. at 52, and the "separate nature of these contractual and statutory rights is not vitiated merely because both were violated as a result of the same factual occurrence," *id.* at 50. The point is that the two claims are distinct and our review of them is distinct. In an appeal from an arbitrator's decision interpreting a collective bargaining agreement, our review is confined to ascertaining whether the arbitrator erred. In doing so, we apply the highly deferential standard of *Michigan Family Resources* and uphold the arbitrator's decision so long as she was "arguably construing or applying the contract" and was not disqualified by fraud or a conflict of interest. *Michigan Family Res., Inc. v. Serv. Employees Int'l Union*, 475 F.3d 746, 753 (6th Cir. 2007). On the other hand, in a civil-rights action in which the district court has granted summary judgment, our review is plenary. We consider de novo the

district court's application of the law to the facts. *See, e.g.*, *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004).

Thus, the concurrence's argument confuses apples with oranges. There can be no risk of collateral attacks or inconsistent judgments because the two judgments at issue—the one involving the correctness of the arbitrator's decision interpreting the collective-bargaining agreement and the one involving the correctness of the district court's decision granting or denying relief on the employee's civil-rights claims—have nothing to do with one another. Applied to the facts here, were we to decide that Nance was indeed "terminated" for purposes of her ADA claim, that conclusion would in no way invalidate an earlier (but non-existent in this case) decision of this Court affirming the arbitrator's finding that she was *not* terminated within the meaning of the collective-bargaining agreement. This is true because the questions presented in each appeal, and the legal standards by which they are evaluated, are completely different.

This brings us to our final, and most important, disagreement with our concurring colleague. We take the concurring opinion at its word when it says that its purpose in writing separately is to present an adjudicative approach that "affords all of our precedent its due respect." Concurring Op. at 17. Rather than accomplishing this worthy goal, however, we think that the concurrence's preferred approach elevates the importance of our decision in *Michigan Family Resources* and gives short-shrift to more pertinent Supreme Court precedent.[4]

As described above, *Michigan Family Resources* sets the standard for reviewing arbitral decisions enforcing collective bargaining agreements, and it sets a very deferential standard at that. We are bound to affirm an arbitrator's decision so long as we conclude that she was "arguably construing or applying the contract." 475 F.3d at 753. Our affirmance is required even when we believe that "the arbitrator made 'serious,' 'improvident' or 'silly' errors in resolving the merits of the dispute." *Id.* In crafting the "arguably construing" inquiry, we acknowledged that this standard would allow a court to vacate "only the most egregious [arbitral] awards." *Id.*

The concurring opinion would have us import the *Michigan Family Resources* test into our consideration of federal civil-rights claims, an approach that, by our count, has been adopted by no other court. Here, even if we concluded that the arbitrator's finding that Nance was not terminated within the meaning of the CBA was "improvident," "silly," or just plain wrong, we would nonetheless be compelled to defer to it (assuming the "arguably construing" standard was satisfied). This in turn would put an end to Nance's ADA claim.

The problem with this reasoning is that it turns Supreme Court precedent on its head. The whole point of *Alexander* and its progeny is to ensure that the federal courts' ability to decide federal civil-rights claims—even those that grow out of the same facts as the claims submitted to labor arbitration proceedings—are not controlled or handicapped by what happens in the arbitral forum. Rather than observing this strict separation, and protecting the authority of the federal courts, our concurring colleague would intertwine the two proceedings, making federal judges' consideration of the merits of civil-rights claims dependent upon an arbitrator's interpretation of the collective bargaining agreement.

The danger of this approach to the enforcement of federal civil-rights laws has already been contemplated by the Supreme Court. The Court has repeatedly emphasized that an arbitrator's duty is to effectuate the intent of the parties by interpreting the collective bargaining agreement, and that she has no other authority outside of the contract. *See Barrentine*, 450 U.S. at 744. Thus, even if

---

[4] Not once did the court in *Michigan Family Resources* cite to *Alexander*, *McDonald*, *Barretine*, or any other case dealing with the effect of a prior arbitration on statutory rights. Nor do the words "civil-rights," "statutory rights," or "collateral estoppel" even appear in the opinion.

a proper interpretation of the contract would contradict federal law, the arbitrator must give effect to the contract. *See id.* (An arbitrator "has no general authority to invoke public laws that conflict with the bargain between the parties.") (citing *Alexander*, 415 U.S. at 53). The result is that an arbitrator "may issue a ruling that is inimical to the public policies underlying [federal law], thus depriving an employee of protected statutory rights." *Id.*

The concurrence disregards this possibility, and in so doing fails to give *Alexander* and its progeny their "due respect." By endorsing a rule that requires us to give preclusive effect to an arbitrator's contractual interpretations that satisfy the *Michigan Family Resources* standard, our concurring colleague is in effect saying that even if the arbitrator's conclusion is opposite to the conclusion we would reach in presiding over a federal civil-rights action or, worse yet, even if the arbitrator's conclusion is contrary to federal law, we are nonetheless bound to defer to it. We do not share the concurrence's peculiar reading of precedent, nor do we share its anemic view of our responsibility as federal judges to independently interpret and apply federal statutes.

## C.

Although the district court incorrectly concluded that Nance was barred from bringing her ADA and related claims in federal court and declined to address the merits of her ADA claim, our review of the record makes clear that summary judgment for Goodyear is still appropriate. *Dobbs-Weinstein v. Vanderbilt Univ.*, 185 F.3d 542, 545 n.2 (6th Cir. 1999) (holding that this Court may affirm the judgment of the district court on any grounds supported by the record, even if they are different from those relied upon by the district court).

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).[5] Nance makes three distinct claims of discrimination: (1) she was terminated because of her disability; (2) she was constructively discharged because of her disability; and (3) she was not given reasonable accommodations as required by the ADA. Each will be considered in turn.

## 1.

To prevail in a disability discrimination case, a plaintiff must show: (1) she was "disabled" under the ADA; (2) she was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations; (3) she suffered an adverse employment action; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) a nondisabled person replaced her. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996). Nance attempts to meet this burden by presenting inferential evidence of discrimination, requiring us to apply the familiar *McDonnell Douglas* burden-shifting framework. Once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If the defendant does so, the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination. *Id.* Although the burdens of production shift, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). "On a motion for summary judgment, [this Court] considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000).

---

[5] Both federal and Tennessee disability discrimination actions require the same analysis. *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 705 (Tenn. 2000).

Nance cannot show that she suffered an adverse employment action, and thus has not established a prima facie case of discrimination. Under Article X(c) of the CBA, an employee who is absent for seven scheduled work days or more, without calling in to Goodyear explaining the reasons for her absence, is considered to have resigned without notice. Although this section technically applies to "absences without leave," Article X(b)(1) of the CBA also states that "an employee who has been placed on the 'Employment Roll,'" or medical leave, "continues to be responsible to report off directly to his resident department." (JA 294-95.) Moreover, even if there is a strict textual question of whether the CBA subjects employees on medical leave to the same seven-day requirement, it is undisputed that the contract has been universally interpreted in such a manner. At Nance's workers' compensation proceeding, Lance Jackson, a manufacturing team specialist at Goodyear, testified to the requirements to call in while on medical leave:

> "[W]e have got various numbers, they call off and report off daily until they get doctor's coverage where they can report off once a week and some people report off daily at first and then they go to once a week. They usually report either to myself or to a call off phone."

(JA 533.) Jackson's testimony was unrebutted.

Furthermore, Nance was aware of these requirements. As a result of her initial injury, between April 19, 2002 and May 10, 2002, Nance took leave from work and "reported off" for several weeks, but initially failed to document the reasons for her absences. By letter of May 10, 2002, Goodyear told her that she must continue to document the reason for her absence from work or else jeopardize her employment under the provisions of the CBA. Thus, she was on notice that Article X(c) applied not only to employees who are absent, but also to employees who are on medical leave. Goodyear confirmed this fact when Human Resources representative Hill sent Nance a letter, which Nance admits receiving, advising Nance that she was being placed on medical leave of absence. The letter reminded Nance that she is still "responsible for reporting off to [her] resident department." (JA 284.) Indeed, Nance admits that prior to the termination of her employment relationship, she understood these very requirements.

Nance argues that Goodyear failed to follow company procedure in determining that she resigned without notice. In particular, she contends that Goodyear should have sent her a letter notifying her that she had failed to report in and given her a two day "cool-off" period before officially ending the employment relationship. Although it is true that Nance did not receive either a written warning, a two-day suspension, or a notification that she would be terminated if she failed to "report in," these procedural protections only apply when Goodyear is terminating an employee *for cause* under its disciplinary policy, not when an employee is deemed to have resigned without notice. If an employee is on approved medical leave of absence, and fails to report in for a period of seven days, the terms of the CBA are explicit: the employee is considered to have resigned without notice. And when an employee voluntarily resigns, she cannot claim that she suffered an adverse employment decision under the ADA. *See Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 447 (6th Cir. 1999).

Nance also argues that other employees on medical leave were not subject to the strict seven-day time-frame to report in. While testimony supports the contention that employees on medical leave did not have to call in every day, there is no evidence from the record that similarly situated employees were not required to report their absences altogether. Indeed, the facts of this particular case require us to place the fault directly on Nance. After Hill sent the January 8, 2004 letter reminding Nance of her obligation to call in on a regular basis, Nance did not return to work, nor did she call in to report her absences. A few weeks later, McClure, then Goodyear's business center auditor for the plant's Banbury area, called Nance at her home on January 29 and 30, 2004 to inquire

about her absence.  The first time he left a voice message which Nance said she did not receive.  On January 30, he reached her by telephone, but Nance "told him [she] could not talk to him . . . [a]nd [] hung up the phone." (JA 224.)  It appears that Goodyear made a good faith effort to give Nance an opportunity to explain her absenteeism.  There is nothing in the record for us to conclude that anything more—e.g., a written notice, review board, or two-day suspension—should have been required.

Finally, according to the factors listed in *Alexander*, Nance's prior arbitration resolves any ambiguity in favor of Goodyear.  First, the hearing appeared to be procedurally adequate.  Though Nance claims she was not represented by counsel, the record indicates that both Union representatives and a Union attorney appeared on her behalf, and that she was afforded an opportunity to present evidence, cross-examine witnesses called by Goodyear, and offer arguments in support of her position.  And while the arbitral determination failed to give any consideration to Nance's ADA claims, the issue in dispute was "solely one of fact, specifically addressed by the parties and decided by the arbitrator on the basis of an adequate record." *Alexander*, 415 U.S. at 60 n.21.

**2.**

Nance contends that she was "constructively discharged" and thus subject to an adverse employment action when Goodyear forced her to work without a safety gate and under poor lighting.  "To maintain an action for constructive discharge . . . , [Nance] must show that 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Neilley v. State Farm Ins. Co.*, No. 98-2114, 1999 WL 1281717, at *6 (6th Cir. Dec. 29, 1999) (quoting *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 887 (6th Cir. 1996)).  We have required a plaintiff to "produce evidence of an intent to discriminate" in order to establish a constructive discharge claim.  *Id*.  This analysis "requires an inquiry into both the objective feelings of the employee and the intent of the employer." *Id.* (citation omitted).  Thus, even if Nance can show that a reasonable person in her position might be targeted, she must also show "foreseeability on the part of the employer." *Id.*

We find no evidence that Nance's working conditions were so difficult or unpleasant that a reasonable employee would resign.  Between eleven and fifteen employees occupy the machine-cleaner position at any given time, working in three shifts over a twenty-four hour period, and none have complained about either the safety gate or the lighting.  Furthermore, not only did Nance admit that she failed to file a grievance concerning any of her safety concerns, but she also quit after only four days of work.  It would be difficult for Goodyear, through its supervisory personnel, to foresee that Nance would feel constructively discharged in such a short period of time.

The record is also barren of any evidence that Goodyear placed her in the machine-cleaner position with the intent to force her into resigning.  The machine cleaner is an established bargaining-unit position that pays nearly the same as her previous job as a stock trucker.  Even if we assume that the machine-cleaner position is less desirable than some other jobs, an assumption that Nance has not established, Goodyear did not violate the ADA by transferring Nance to that position. *Burns v. Coca-Cola Enter., Inc.*, 222 F.3d 247, 258 (6th Cir. 2000) ("Allowing [plaintiff] to recover despite his failure to abide by [defendant's] non-discriminatory policy requiring him to apply for a transfer to a new position within his restrictions would convert a nondiscrimination statute into a mandatory preference statute, a result which would be inconsistent with the nondiscriminatory aims of the ADA. ") (citation omitted).

**3.**

Because we have determined that, under the provisions of her contract with Goodyear, Nance effectively resigned by not reporting in, it is not necessary to address the rest of her ADA claims. *Hammon*, 165 F.3d at 447; *see also EEOC v. United Parcel Serv., Inc.*, 249 F.3d 557, 563 (6th Cir. 2001) (per curiam).

However, even if we were to address Nance's arguments that she did not receive the required reasonable accommodations under the ADA, they are meritless. The ADA defines "discrimination" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). The Act further defines "reasonable accommodation" to include:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

*Id.* § 12111(9).

The ADA's regulations indicate that, "[t]o determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the qualified individual with a disability in need of accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). "Even though the interactive process is not described in the statute's text, the interactive process is mandatory, and both parties have a duty to participate in good faith." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007).

Nance alleges that Goodyear failed reasonably to accommodate her in the following ways: (1) It did not provide her with a safety bar and adequate lighting at the machine-cleaner position; (2) It did not provide her reasonable accommodations for the stock-trucker position; (3) It generally acted in bad faith.

First, Nance provides no evidence that both the safety bar and lighting were necessary accommodations in light of her physical limitations. Nor does Nance show that she could not, because of her disability, meet the demands of the machine-cleaner position. Admittedly the tools that Goodyear gave Nance, which included a hand-held scoop made from a coffee can and two teflon pans, appear crude. But however crude these tools might be, they were officially recommended by Goodyear's physical therapist, Gilliam. In any event, Nance does not dispute their effectiveness.

Moreover, the record shows that Goodyear met with Nance, her Union representative, and Gilliam to review lists of jobs at the plant in an effort to match her lifting restrictions with the jobs' physical requirements. After initially placing her in the stock-trucking position, Nance removed herself from that position because of neck and shoulder pain. Nance was officially medically disqualified from that job in a meeting where she and her Union representative were present. Outside of Nance's general allegations, there is simply no specific evidence that Goodyear participated in these meetings in bad faith. *See Kleiber*, 485 F.3d at 871 ("When a party obstructs the process or otherwise fails to participate in good faith, courts should attempt to isolate the cause

of the breakdown and then assign responsibility.") (citation omitted). Finally, even if Goodyear could modify the stock-trucking position, the ADA explicitly includes "reassignment to a vacant position" as a reasonable accommodation. As such, Nance's transfer to the machine-cleaner position could in no way be construed as a violation of the ADA.

It is not entirely clear whether Nance is also arguing that she was denied another job at Goodyear for which she was qualified. Nevertheless, to overcome summary judgment, the plaintiff generally must identify the specific job she seeks and demonstrate that she is qualified for that position. *Burns*, 222 F.3d at 258-59. Because she has failed to meet her burden in all respects, summary judgment is appropriate.

## IV.  FMLA CLAIMS

Nance further alleges that she is qualified for FMLA leave. The FMLA entitles eligible employees to twelve weeks of unpaid leave during any twelve-month period for certain statutorily prescribed reasons. 29 U.S.C. § 2612(a)(1). The FMLA defines the term "eligible employee" as:

> [A]n employee who has been employed--
> (i) for at least 12 months by the employer with respect to whom leave
> is requested under section 2612 of this title; and
> (ii) for at least 1,250 hours of service with such employer during the
> previous 12-month period.

29 U.S.C. § 2611(2)(A).

It is undisputed that Nance actually worked only 374 hours, well below the 1250-hour threshold she needed to qualify under the FMLA. However, Nance appears to argue that her post-termination hours should count toward the FMLA calculation, and points to this Court's decision in *Ricco v. Potter*, 377 F.3d 599, 605 (6th Cir. 2004), for support. In *Ricco*, this Court created an exception for "hours that the employee wanted to work but was *unlawfully prevented* by the employer from" doing so. *Id.* (emphasis in original). It explicitly distinguished time that an employee does not work due to unlawful termination from failure to work due to vacation or illness. *Id.* Since we have already determined that Nance resigned without notice, and was not unlawfully terminated, she does not meet the hours requirement, and so she is not qualified for relief under the FMLA.

## V.  RETALIATORY DISCHARGE AND WHISTLEBLOWER CLAIMS

Nance appears to argue that Goodyear terminated her for "reporting dangerous working conditions" in violation of the Tennessee Public Protection Act, also known as the Whistleblower Law, Tenn. Code Ann. § 50-1-304(a), but fails to cite either statute in her appellate brief or develop the argument with specificity. Accordingly, her argument is waived. *See Indeck Energy Serv., Inc. v. Consumer Energy Co.*, 250 F.3d 972, 979 (6th Cir. 2000) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived . . . .") (citation omitted). Even if we were to consider this argument, to make a prima facie case of retaliatory discharge under the Act, the employee must prove that she was actually discharged. *Guy v. Mutual of Omaha Ins. Co.*, 79 S.W.3d 528, 535 (Tenn. 2002). For the reasons set forth above, Nance has not met this requirement.

## VI. OUTRAGEOUS CONDUCT AND BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING CLAIMS

Neither of these arguments is developed with sufficient specificity, and therefore each is waived. Nevertheless, these claims are also meritless. To prove "outrageous conduct," a plaintiff

must show that the defendant's conduct "has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Bain v. Wells*, 936 S.W.2d 618, 623(Tenn. 1997) (citation omitted). Moreover, the duty of good faith and fair dealing "requires a contracting party to do nothing that will have the effect of impairing or destroying the rights of the other party to receive the benefits of the contract." *Elliott v. Elliott*, 149 S.W.3d 77, 85 (Tenn. Ct. App. 2004). Nance bases both these claims on the allegation that Goodyear placed her in a dangerous workplace condition and terminated her illegally. Because we find that Nance resigned without notice pursuant to the terms of her contract, and that Goodyear did not subject Nance to unfair working conditions, Goodyear cannot be held liable under either of these claims.

## VII. CONCLUSION

In sum, Nance has not raised a genuine issue of material fact as to any of her claims. Accordingly, we **AFFIRM** the judgment of the district court.

---

**CONCURRENCE**

---

ALICE M. BATCHELDER, Circuit Judge, concurring. I concur in the outcome and part of the analysis, but write separately because I do not agree that we are entitled to conduct a plenary re-interpretation or application of the collective bargaining agreement (CBA), as the lead opinion does in Sections III.A and III.C.1. Therefore, I cannot join the lead opinion's statement that "we have determined that, under the provisions of her contract with Goodyear, Nance effectively resigned by not reporting in." Put simply, I do not believe that this determination on the meaning or application of the CBA is ours to make. I also disagree with Section III.B, which mischaracterizes my position.

**I.**

I agree that *Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974), disallows the use of claim preclusion (*res judicata*) to bar Ms. Nance's action from federal court. Indeed, "[t]here is no suggestion in the statutory scheme that a prior arbitral decision either forecloses an individual's right to sue or divests federal courts of jurisdiction." *Id*. at 47. But, I do not agree that *Alexander* and its progeny disallow the use of issue preclusion (collateral estoppel) to bar the re-litigation of *any* issue raised anew in the subsequent action. Specifically, I do not agree that *Alexander* or its progeny explicitly disallow the use of issue preclusion to bar the re-litigation of an issue that is solely dependent on an interpretation or application of the CBA (such as the resignation-under-the-CBA issue in this case) and, hence, otherwise specifically committed to the expertise of the arbitrator. *See Alexander*, 415 U.S. at 53-54 ("Thus the arbitrator has authority to resolve only questions of contractual rights, and this authority remains regardless of whether certain contractual rights are similar to, or duplicative of, the substantive rights secured by Title VII."); *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728, 737 (1981) ("While courts should defer to an arbitral decision where the employee's claim is based on rights arising out of the collective-bargaining agreement, different considerations apply where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers."); *Wright v. Univ. Maritime Serv. Corp.*, 525 U.S. 70, 78-79 (1998) ("That presumption [favoring arbitration of contractual disputes] does not extend beyond the reach of the principal rationale that justifies it, which is that arbitrators are in a better position than courts to interpret the terms of a CBA."). Having said that, however, I am not inclined to hold that an arbitrator's decision, standing on its own, should necessarily receive preclusive effect. If the arbitrator's decision had been appealed and we were instead confronted with a prior decision from this court, my opinion might be different. *See McDonald v. City of West Branch*, 466 U.S. 284, 288 (1984).

To be sure, *Alexander*, 415 U.S. 50-54, holds that, based on the same underlying facts and circumstances, a plaintiff may have a remedy based on either a contractual right or a statutory right, without necessarily having a remedy based on both (i.e., the absence of a remedy based on one does not foreclose a plaintiff's right to seek, and receive, relief based on the other). Specifically, *Alexander* holds that an arbitrator's decision that an employer did not violate the nondiscrimination clause of its CBA (i.e., the contractual right) does not preclude that employee from seeking a decision from a federal court that the very same conduct does violate Title VII (i.e., a statutory right). The analogous construct in the present case would be that the arbitrator's decision that Goodyear did not terminate Ms. Nance under the terms of Article X of its CBA does not preclude Ms. Nance from seeking a decision from the federal court that the very same conduct does constitute "termination" without regard to the CBA, i.e., under a federal statute. But that is not what the lead opinion says here. The lead opinion says that Ms. Nance has a right to have a federal court decide whether Goodyear terminated her under the CBA based on the court's re-interpretation and re-application of Article X of the Goodyear CBA. The broader implication — and, presumably, the

intention — of this assertion is that a plaintiff has a right to a federal-court re-determination of *any* finding, even those that are entirely dependent on the terms of the CBA (and the expertise of the arbitrator).

Not only is this assertion inconsistent with *Alexander*, 415 U.S. at 53-54, *Barrentine*, 450 U.S. at 737, and *Wright*, 525 U.S. at 78-79, as were cited in the foregoing paragraph, it would also empower a plaintiff to collaterally attack even an express holding of a prior panel of this court. Suppose Ms. Nance had appealed the arbitrator's decision that she had resigned— a decision based entirely on the arbitrator's application of Article X of the CBA. And suppose a panel of this court had affirmed that decision. If it is true, as the lead opinion asserts, that Ms. Nance could thereafter re-litigate that same issue (i.e., the proper interpretation and application of Article X of the CBA, in regard to whether she resigned) under the auspices of a civil rights action, then the prior panel's holding on that issue would be nothing more than an advisory opinion. I submit that, because we have no authority to render advisory opinions, *see Sierra Club v. Morton*, 405 U.S. 727, 732 n.3 (1972), our ability to hear appeals from arbitrators' decisions is henceforth in doubt.

This brings me to my second point. If, as I have hypothesized, the parties had appealed the arbitrator's decision directly, we would not have reviewed that decision *de novo*. On direct appeal, we would have reviewed that decision under the deferential standard that we recently set out in *Michigan Family Resources, Inc. v. Service Employees International Union*, 475 F.3d 746, 753 (6th Cir. 2007) (en banc) (confining our review of an arbitrator's decision to: (1) whether the dispute was committed to arbitration; (2) whether the arbitrator was, at least arguably, construing or applying the contract to resolve the dispute; and (3) whether the decision was tainted by any "procedural aberration," such as fraud, conflict of interest, or dishonesty). Consequently, if the parties had appealed the arbitrator's decision directly and we had before us a prior, judicial decision from a panel of this court, then I believe we would now face a different question regarding issue preclusion.

Since the arbitrator's decision in this case was not appealed, however, we are not confronted with a prior decision from a panel of this court, but only a prior decision from an arbitrator, albeit a decision on an issue that is indisputably entirely dependent on an interpretation or application of a term in the CBA and, hence, otherwise specifically committed to the expertise of the arbitrator. From an issue preclusion standpoint, I read *Alexander* and its progeny as prescribing *de novo* review of disputes and questions concerning interpretation or application of federal statutes, regardless of the contract, but not disputes and questions concerning only interpretation or application of the contract or CBA. *See Alexander*, 415 U.S. at 56 ("Arbitral procedures, while well suited to the resolution of contractual disputes, make arbitration a comparatively inappropriate forum for the final resolution of rights created by Title VII."). Therefore, I believe that, by conducting a *de novo* review of the meaning and applicability of Article X of the Goodyear CBA with respect to the resignation-as-determined-by-the-CBA question, we have allowed a plaintiff to collaterally attack the arbitrator's decision in a way that contradicts our *Michigan Family Resources* precedent, merely by filing a statutory-rights-based claim in federal court, regardless of its merit,[1] and thus, to circumvent the deferential standard of *Michigan Family Resources* on an issue that is purely contractual.

To repeat, I simply do not believe that we are entitled to interpret or apply the contract *de novo* in this context, when we could not do so on direct review. I believe the proper approach to this type of situation — one which reconciles *Alexander* and *Michigan Family Resources* — is to review an arbitrator's decision on a purely contractual claim under the *Michigan Family Resources*

---

[1] One need look no further than Section III.C.1. of the lead opinion, which contains a detailed inquiry into the interpretation and application of Article X of the Goodyear CBA, even though the arbitrator had already resolved this issue definitively, and even though the lead opinion ultimately concludes that Ms. Nance's claims lack merit.

standard, and review statutory-rights-based claims under a *de novo* standard, in accordance with *Alexander*. I believe this fits the case law and affords all of our precedent its due respect.

## II.

The lead opinion fails to rebut my explanation of *Alexander* and my practical reconciliation of *Alexander* with *Michigan Family Resources*. Its contention that the present case cannot be distinguished from *Alexander* relies on a mischaracterization of *Alexander*'s premise as a purely contractual question of whether Mr. Alexander's employer had "just cause" for firing him under the terms of the CBA, which the lead opinion equates to the question of whether Ms. Nance "resigned." But, in actuality, the Supreme Court framed *Alexander* as follows:

> The District Court granted respondent's motion for summary judgment and dismissed the action. The court found that the *claim of racial discrimination* had been submitted to the arbitrator and resolved adversely to petitioner. It then held that petitioner, having voluntarily elected to pursue his grievance to final arbitration under the *nondiscrimination clause of the collective-bargaining agreement*, was bound by the arbitral decision and thereby precluded from suing his employer under Title VII. The Court of Appeals for the Tenth Circuit affirmed per curiam on the basis of the District Court's opinion. We granted petitioner's application for certiorari.

*Alexander*, 415 U.S. at 43 (citations, footnote, and paragraph break omitted; emphasis added). Thus, in *Alexander*, the arbitrator resolved a "claim of racial discrimination" under the "nondiscrimination clause of the [CBA]," even though discrimination is a matter of federal statutory law and not the type of issue properly bargained away in a CBA or for determination by a labor arbitrator; whereas the arbitrator in the present case resolved a claim that Ms. Nance had resigned when she failed to call in, as prescribed by the terms of the Goodyear CBA, which is exactly the type of issue properly relegated to collective bargaining, and hence, appropriately determined by an arbitrator.

Indeed, the whole point of *Alexander* was that the issue to be resolved — the "claim of racial discrimination" under the "nondiscrimination clause of the [CBA]" — was the type of issue committed to federal statute and to determination by a federal court, not the type of issue properly relegated to a CBA or to determination by a labor arbitrator. Thus, the lead opinion's contention that the present case cannot be distinguished from *Alexander* is unpersuasive, inasmuch as the point of *Alexander* was to draw this very distinction: some issues are properly submitted to federal courts (i.e., federally protected rights), while other issues are properly submitted to labor arbitrators.

The lead opinion asserts that "*Alexander* and its progeny" expressly provide for a dissatisfied employee to collaterally attack an arbitrator's decision in a way that otherwise contradicts *Michigan Family Resources*.[2] This argument is specious. The lead opinion cites four Supreme Court cases[2] and eight Circuit Court cases,[3] but not one of those cases does what the lead opinion does here — re-interpret the CBA and apply it to the facts of the case to reach its decision. In short, the lead opinion offers no controlling precedent to justify its approach.

---

[2] *Wright*, 525 U.S. at 70; *McDonald*, 466 U.S. at 284; *Barrentine*, 450 U.S. at 728; *Alexander*, 415 U.S. at 36.

[3] *Wilmington v. J.I. Case Co.*, 793 F.2d 909, 918 (8th Cir. 1986); *Gonzalez v. S. Pacific Transp. Co.*, 773 F.2d 637, 643 (5th Cir. 1985); *Becton v. Detroit Terminal of Consol. Freightways*, 687 F.2d 140, 141-42 (6th Cir. 1982); *Aleem v. Gen. Felt Indus., Inc.*, 661 F.2d 135, 137 (9th Cir. 1981); *Lyght v. Ford Motor Co.*, 643 F.2d 435, 438 (6th Cir. 1981); *Wiedemann v. Oklahoma City*, 76 F. App'x 931, 932 (10th Cir. 2003); *Grappe v. Kansas City S. R.R.*, 71 F. App'x 302, 303 (5th Cir. 2003); *Williams v. Perry*, No. 00-7366, 2000 WL 1506086, at *5-7 (2d Cir. Oct. 6, 2000).

Not only is there no controlling precedent to justify this approach, there is no reason behind it either. There is no good reason to create a system in which a dissatisfied employee is allowed to collaterally attack an arbitrator's decision in a way that contradicts our established precedent, or that might well lead to contradictory results from two panels of this court in a case arising from common circumstances, involving the same parties, and concerning the identical issue. Hence, the lead opinion's only recourse is to argue that *Alexander* and its progeny represent a sweeping proclamation by the Supreme Court disallowing the use of issue preclusion (collateral estoppel) to bar the re-litigation of *any* issue raised anew in the subsequent action (thereby expressly allowing collateral attack and the possibility of inconsistent judgments). But, the lead opinion does not explain *why* the Supreme Court (or any court) would do this, when courts go to such lengths to avoid these consequences in every other aspect of the law. The simple answer is that it would not.

The fact is that the Supreme Court did draw a distinction — between those issues to be resolved under a CBA (by an arbitrator) and those issues to be resolved under federal law (by a court). The lead opinion — apparently recognizing my point — proclaims that: "whether [Ms.] Nance resigned without notice might mean one thing under Goodyear's CBA, but it might very well mean an entirely different thing for the purposes of an 'adverse employment action' under the ADA." Having said this, however, the lead opinion fails to realize what it had said just one sentence earlier (and what I have been saying all along) — "While the expertise of arbitrators lies in the application of facts to the terms of an employee's contract or collective bargaining agreement, the expertise of federal courts lies in the application of facts to anti-discrimination statutes." The *arbitrator* is peculiarly qualified to decide the question of "whether [Ms.] Nance resigned . . . under Goodyear's CBA," while the *court* is peculiarly qualified to decide "whether [Ms.] Nance resigned . . . for the purposes of an 'adverse employment action' under the ADA." It is that simple.

But, after acknowledging that these are two different questions, each peculiarly suited to a decision-maker with unique expertise, the lead opinion decides to treat them the same, dismissing the arbitrator's expertise and assigning them both to review by the federal court, despite its recognized lack of expertise as to the first question. As "support" for this decision, the lead opinion offers nothing more than an itemization of the shortcomings of the arbitration process as a whole. Indeed, if the issue confronting us were whether an arbitrator's decision should be entitled to some respect or deference by a court of law, I would say this argument is a good one. But that is not the issue confronting us, and that argument does not address the issue that we do confront.

For all of the foregoing reasons, I reiterate my position that I read *Alexander* and its progeny as prescribing *de novo* review of disputes and questions concerning federal statutes, regardless of the contract, but not for disputes and questions concerning only the contract. The meaning or interpretation of the contract should be decided by the arbitrator and reviewed pursuant to our deferential standard, as set forth in *Michigan Family Resources*, 475 F.3d at 753.

### III.

Finally, even if I agreed to treat the arbitrator's decision as "merely evidence," as the lead opinion does, I would question its admissibility in this case on an evidentiary basis, as this "evidence" is almost certainly hearsay. To be sure, *Alexander*, 415 U.S. at 60, said "[t]he arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate," but *Alexander* — decided February 19, 1974 — predated the enactment of the Federal Rules of Evidence, and the *Alexander* Court was not confronted with present-day hearsay concerns. I realize that, in other post-*Alexander* scenarios, courts have admitted arbitrators' rulings as hearsay exceptions, pursuant to public records exception, Fed. R. Evid. 803(8), or the residual exception, Fed. R. Evid. 807. In such cases, the parties argued the admissibility of the particular arbitrator's decision and the district court rendered a decision pursuant to those arguments. I believe this to be the proper approach. But, here, the lead opinion disregards the hearsay aspect of the arbitrator's

opinion and renders a decision that could be read in either of two ways: (1) an arbitrator's opinion is *per se* admissible, despite its hearsay character or questions of reliability or relevance; or (2) the admissibility of an arbitrator's opinion is to be determined by the factors set forth in *Alexander*, 415 U.S. at 60 fn. 21, regardless of its hearsay character. I find either of these objectionable.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801. If we are to treat the arbitrator's decision as merely evidence, then that decision is almost certainly hearsay — i.e., the arbitrator's decision is a statement made by a declarant (i.e., arbitrator) who is not presently testifying, offered into evidence to prove the truth of the matter asserted (i.e., arbitrator's opinion on the matter). And, trial courts do not render *sua sponte* decisions on the admissibility of hearsay evidence; that is for the parties to raise and argue, which was never done in this case.

Finally, the lead opinion's suggestion in its footnote three that the Supreme Court "approved of this approach" in *McDonald v. City of West Branch*, 466 U.S. 284, 292 n.13 (1984), is seriously inaccurate. In footnote thirteen to *McDonald*, the Supreme Court stated: "an arbitral decision *may* be admitted as evidence" (emphasis added), and then quoted *Alexander* regarding the "weight to be accorded an arbitral decision" upon its admission. There was no discussion whatsoever of its admissibility subject to a hearsay challenge.

**IV.**

For all of the forgoing reasons, I concur in the judgment but not the entire analysis.